UNITED STATES, Appellee

v

MELVIN LEE SHAW, Seaman, U. S. Navy, Appellant

9 USCM 267, 26 CMR 47

No. 10,550

Decided May 23, 1958

*Commander Charles Timblin*, USN, argued the cause for Appellant, Accused.

*Lieutenant (jg) John V. L. Ellicott*, USNR, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Charles H. Beale, Jr.*, USMC.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The question in this case is the admissibility of testimony by a Navy psychiatrist. No objection to the testimony was made at the trial, but the accused now contends that it is inadmissible and prejudicial.

After apprehension on suspicion of committing certain offenses on board ship, the accused was sent to a Navy hospital for observation. He remained for about a week. Shortly after his release, charges were filed against him for the theft of four wrist watches from

268

the ship's store, and a pistol from the ship's armory; house breaking; and assault with a dangerous weapon, in violation of the Uniform Code of Military Justice. The charges were referred to trial. In his opening statement, defense counsel told the court that the defense would "endeavor to show . . . that at the time of the alleged acts and incidents the accused was mentally irresponsible."

The defense's case consisted entirely of testimony about the accused's behavior and appearance before and after the events in issue. The principal evidence was a stipulation of testimony by a civilian psychiatrist who had examined the accused. In part, the doctor testified that the accused told him that "he does not recall anything" that happened to him from the time he opened the door to the ship's bake shop until he awakened in a port crane of the ship approximately four hours later. The accused further informed the doctor that he subsequently "was advised" that he had broken into the ship's armory and ship's store and that he had "challeng[ed]" a member of the ship's company with a gun. Electroencephalographic findings were "suggestive" of certain conditions which "might indicate . . . a convulsive tendency with localized brain damage." Further study was required to determine the cause of the findings, and to rule out evidence of a lesion in the left anterior cerebrum which "might have precipitated a episode" of the kind related by the accused. The doctor concluded that, although there was no definite evidence that the accused is mentally incompetent, "there is a question whether he knew right from wrong during the period of this so-called assault and felony."

In rebuttal, the prosecution called Lieutenant R. C. Ovington, a Navy neuro-psychiatrist. He testified that he examined the accused while the accused was in the Navy hospital. He knew that the accused was suspected of committing certain offenses aboard ship. He evaluated the accused's mental condition and concluded that there was "no evidence of any psychiatric disability of any illness." He recounted conversations with the accused which took place in the course of his examination in which the accused related many details regarding the alleged offenses. In the opinion of the doctor, disclosures of this nature were not consistent with an amnesic condition.

Throughout the trial, both the Government and the defense stressed the fact that there were only two real issues before the court. One was whether the weapon was loaded when the accused pointed it at Boatswain Mate Wyatt, when the accused was discovered in the port crane; the other was the accused's mental condition.

Appellate defense counsel attacks the admissibility of Lieutenant Ovington's testimony on two grounds. First, he contends that the relationship between the lieutenant and the accused was that of psychiatrist-patient, and, consequently, communications between them were privileged. The contention is contrary to the Manual provision that "no privilege attaches" to communications between military personnel and military doctors (paragraph 151c(2)) and the rule that the privilege does not exist in the absence of a statute. People v Lane, 101 Cal 513, 36 Pac 16; Banigan v Banigan, 26 RI 454, 59 Atl 313. Counsel urges us to disregard the Manual provision and the common-law rule as inconsistent with the requirements of justice and the provisions of 18 USC § 4245. But see United States v Smith, 5 USCMA 314, 321, 17 CMR 314; cf. United States v Jacks, 8 USCMA 574, 25 CMR 78. The view we take of the question makes it unnecessary to reach the substance of the argument. Not only was there no objection to Dr. Ovington's testimony, but the defense first presented medical evidence regarding the accused's mental condition.[1] Appel-

---

[1] We are not to be understood as holding that the relationship between Dr. Ovington and the accused was that of physician-patient. Dr. Ovington testified that he was the accused's "physician" but he also said that he evalu-

late courts are divided on whether such action constitutes a waiver of the physician-patient privilege.[2] In our opinion it does. The purpose of the privilege is to protect the patient from unnecessary disclosure of an ailment for which he has obtained treatment from a doctor. The reason for the privilege disappears when the patient himself reveals the existence of his ailment. In applying waiver in a like situation, the New York Court of Appeals said:

"When the respondent called a physician as a witness who testified that for at least seven months the respondent had been suffering from 'active pulmonary tuberculosis,' he exposed his condition to the public and disclosed the secret which the statute was enacted to protect · and keep secret. By his own act he removed the prohibition of the statute and waived upon the trial the protection which it afforded him.

"The contention that a patient may waive the privilege afforded by the statute himself by calling a physician and disclosing his physical condition and at the same time insist that the statute bars the defendant from calling a physician to describe his physical condition, if sustained, would in many cases result in injustice and fraud. It would be making a use of the statute never intended by the Legislature and not now approved by this Court." [Steinberg v New York Life Ins. Co., 263 NY 45, 188 NE 152, 154.]

The second basis of the accused's attack on the admissibility of· Dr. Ovington's testimony is that it violates the provisions of Article 31 of the

Uniform Code in that the doctor did not inform the accused of his rights under the Article. We need not consider whether such advice must be given as a preliminary to an examination of the kind in question. See United States v Bunting, 6 USCMA 170, 19 CMR 296. The accused did not object to the testimony. On the contrary, defense counsel questioned the doctor at length on several aspects of his examination which could have benefited the accused. For example, he inquired into the "pressures" that the accused had indicated were upsetting him and about the possibility that the accused's account of the events was predicated upon information he obtained from other persons. The doctor's testimony does not indicate that the accused was not advised of his rights under Article 31. Had there been an objection to his testimony on that ground, the prosecution might well have been able to show that the advice was in fact given. Under the circumstances, the accused's failure to object constitutes a waiver. United States v Fisher, 4 USCMA 152, 15 CMR 152.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting):

I am unable to reach the issue raised in this appeal because of the presence of a serious error which has not been considered in the principal opinion. After the prosecution had rested its case, the accused in his defense raised the issue of mental responsibility and introduced evidence in support thereof. Mainly relied upon was a stipulation of testimony by a civilian psychiatrist in which he concluded that the accused had had "an episode of unconsciousness of

---

ated the accused's mental condition "to determine whether or not there was anything—any mental derangement, disease, or disability and to evaluate whether he needed any treatment or help and as to the disposition of the case." Under these circumstances the ordinary relationship protected by the privilege may not be present. Simecek v State, 243 Wis 439, 10 NW 2d 161. Catoe v United States, 131 F 2d 16 (CA DC Cir) (1942). Apparently

contra, Edmonds v United States, — F 2d — (CA DC Cir) (February 7, 1958). For the purposes of this case, we are assuming the existence of the physcian-patient relationship.

[2] See Mays v New Amsterdam Casualty Co., 40 App DC 249, cert denied, 238 US 624, 35 S Ct 662, 59 L ed 1494 (no waiver); State v Sapp, 356 Mo 705, 203 SW 2d 425; Steinberg v New York Life Ins. Co., 263 NY 45, 188 NE 152 (waiver).

270

approximately four hours duration which is unexplainable." The prosecution in rebuttal introduced the testimony of a Navy psychiatrist who had examined the accused shortly after the offenses had occurred. During the course of his testimony, the following colloquy took place between the law officer and the trial counsel:

"Q. What did he tell you was the reason for committing these offenses?

"LAW OFFICER: Gentlemen, I am going to limit this testimony—or the effect of it to the credibility of the witness' opinion as to the accused's mental condition. Is that the purpose you are offering it?

"TRIAL COUNSEL: *I am offering it in rebuttal to the medical testimony offered on behalf of the accused, Mr. Law Officer.* It is apparent from that that the conclusions as they are reached from Doctor Campbell are based on a history given by this man of amnesia. I think I am entitled to rebut that testimony by showing that the history given was not true, and therefore the opinion of Doctor Campbell is entitled to a little more weight.

"LAW OFFICER: All right. But the question in my mind is this: Are you offering it as a confession—and I assume you are not; *it is in rebuttal to the stipulated testimony of Doctor Campbell, is that right?*

"TRIAL COUNSEL: *Yes, sir.*

"LAW OFFICER: All right, proceed." [Emphasis supplied.]

In spite of this assurance and the law officer's admonition, trial counsel proceeded to interrogate the witness relating to what the accused had told him "about the commission of the offenses."[3] The law officer should not have permitted trial counsel in rebuttal to exceed the bounds of direct testimony which was limited to the issue of the accused's sanity. Defense counsel surely cannot be charged with waiver under the circumstances when the law officer had *sua sponte* sought to restrict the scope of rebuttal testimony and had even extracted trial counsel's promise to limit the scope of such testimony. It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party. Shepard v United States, 64 F 2d 641 (CA 10th Cir) (1933); Samish v United States, 223 F 2d 358 (CA 9th Cir) (1955); and United States v Crowe, 188 F 2d 209 (CA 7th Cir) (1951). The admission or exclusion of evidence on rebuttal rests largely within the sound discretion of the trial judge. Lelles v United States, 241 F 2d 21 (CA 9th Cir) (1957). Here that discretion was exercised against the Government.

While it was entirely proper for the law officer to limit the scope of rebuttal testimony, it was clearly error on his part to remain mute while trial counsel elicited a confession related by the accused to the psychiatrist in disregard of his earlier ruling. The question of the accused's guilt or innocence was the ultimate issue for the triers of fact and any doubt which they may have entertained was effectively dispelled by the testimony of the Government psychiatrist. I would reverse the conviction and permit a rehearing.

---

[3] The witness answered the question as follows:

"To the best of my recollection, he told me that he broke into the Ship's Store and he stole, I think he said, three or four wrist watches, and that he broke into the armory where the weapons are kept and took, as I recall, a .45 caliber automatic, and I think he said something about having also taken some food, and then he said, as he put it, he holed up in the port crane."

The witness was then asked whether the accused had told him that he had "holed up in the port crane" to which he replied as follows:

"Yes. He said his plan was to avoid detection until the ship reached port. As I recall, at the time he said it was his understanding that the ship was to dock about 1600 or 1700 that day and his plans were, as he said, to jump overboard and go over the hill."