UNITED STATES, Appellee

v

HARRY C. KEMP, Airman Third Class,
U. S. Air Force, Appellant

13 USCMA 89, 32 CMR 89

No. 15,053

May 18, 1962

*Lieutenant Colonel Wallace N. Clark* argued the cause for Appellant, Accused. With him on the brief were *Colonel James L. Kilgore, Colonel Joseph E. Krysakowski,* and *Colonel Daniel E. Henderson, Jr.*

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker.*

## Opinion of the Court

KILDAY, Judge:

### I

Airman Third Class Harry C. Kemp, the accused, and one Schafer were charged jointly with the premeditated murder of a third airman, Harold D. Cartwright, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Accused was, accordingly, brought before a general court-martial convened at McGuire Air Force Base, New Jersey—the locus of the crime—for trial. Schafer had requested that the convening authority appoint enlisted men to the court-martial to try his case, whereas accused Kemp had not. See Article 25(c)(1), Uniform Code of Military Justice, 10 USC § 825. A severance, therefore, was granted, the specification against Kemp was appropriately amended, and the case proceeded to trial as to him.

Before pleading to the charge and specification, the defense requested an out-of-court hearing, thereat indicating accused's desire "to enter a plea of guilty to first degree murder." The case having been referred to trial without instructions that it be treated other than as capital, the law officer inquired whether accused was aware the death penalty might be imposed upon conviction for premeditated murder, and that life imprisonment was mandatory. Kemp assured him he was apprised of

90

the ramifications of a guilty plea; indicated it was his deliberate choice to do so; and expressly denied that any promises or inducements motivated him. It was considered, apparently, that accused might stand in better stead as to sentence if, upon arraignment, he judicially confessed his guilt. Notwithstanding accused's request, however, and adverting to Article 45 (b) of the Uniform Code, 10 USC § 845, and paragraph 70a, Manual for Courts-Martial, United States, 1951, the law officer properly indicated a guilty plea could not be accepted. See United States v McFarlane, 8 USCMA 96, 23 CMR 320. Thereupon, in open court, the defense entered a plea of not guilty.

Accused Kemp was, nonetheless, found guilty as charged of premeditated murder, and the sentence adjudged by the court-martial directed that he be dishonorably discharged from the service, forfeit all pay and allowances, be reduced to the grade of Airman Basic, and be put to death. We note parenthetically that in his separate trial before a different court-martial, Schafer was also convicted of premeditated murder and his sentence was fixed at confinement for life, together with accessory punishments. See United States v Schafer, 13 USCMA 83, 32 CMR 83, this day decided.

The findings and sentence as to Kemp having been approved at intermediate levels of review, the instant case is before us for mandatory review under the provisions of Article 67 (b) (1) of the Uniform Code of Military Justice, 10 USC § 867. Accordingly, we shall review the record and consider every substantial ground of error. United States v Parker, 6 USCMA 75, 19 CMR 201.

## II

Before turning our attention to those matters which we conclude must govern our action in the case at bar, we may, in short order, dispose of two contentions advanced by the defense. One item is an attack on the jurisdiction of this general court-martial over a capital offense committed in the United States during time of peace. For the reasons set forth in the companion case, United States v Schafer, supra, we reject this allegation of error.

So, too, our opinion in *Schafer* governs another issue common to both cases. As to search and seizure, the evidence in the instant case is substantially the same as in *Schafer*, with the exception that Kemp and his cohort are in different positions with regard to standing. That, however, is a wholly unimportant circumstance here. As we pointed out in the companion case, the search may indeed have been somewhat broad but cannot, under the circumstances and as a matter of law, be held unreasonable and illegal. Accordingly, we find no error in this regard.

## III

It is also unnecessary to discuss at length the two arguments urged on behalf of accused relating to the composition and alleged partiality of the court-martial.

As to the first of these matters, it is complained that the instant court-martial was appointed to try Kemp alone, a practice the defense assails as impermissible. We merely invite attention to the fact that the convening authority has broad discretion in selecting and appointing persons to sit as court members. Article 25 (d) (2), Uniform Code of Military Justice, 10 USC § 825. Further, we are unaware of any authority delimiting the convening authority's authority to appoint qualified individuals on courts-martial —if only for the trial of a single case. Cf. Appendix 4, Manual for Courts-Martial, United States, 1951, note 13 at page 464. But more important, and particularly, we cannot subscribe to the defense contention in the case at bar that appointing court members only for the trial of a case to which such pretrial notoriety attached, "conditioned" them, all to accused's prejudice. The short answer is that trial defense counsel, who, we note parenthetically, represented accused well, questioned the

**91**

members on *voir dire*. Nothing was developed, however, indicating any bias or other basis for challenge and, in fact, the defense leveled no challenges, either peremptory or for cause. We are, therefore, constrained to resolve this question against accused.

The same is true, we conclude, of the contention that the court members, by their prolix questioning, cast off their garb of impartiality and donned the robes of advocates for the prosecution. It is indeed true that some two hundred questions were posed to various witnesses by the court-martial during the course of the trial. However, as we noted in United States v Flagg, 11 USCMA 636, 29 CMR 452, the extent of inquiry by members of the court is not the controlling factor. Rather, as we there pointed out, alluding to numerous prior decisions in this area, the test is whether the triers of fact were willing to accord fair consideration to all the evidence. Without belaboring the point, suffice it to state that we do not find, from the court members' participation in the present instance, any partisan advocacy nor any propensity to convict regardless of the evidence. Thus, we find not merit in this contention.

### IV

Finally, before treating with the really critical issue, we turn our attention briefly to the assertion that the law officer erred in admitting accused's confessions into evidence. The essence of this contention is that the extrajudicial statements were obtained involuntarily.

We agree with the board of review that this alleged error must be resolved against accused, and see no reason for extended discussion. It is sufficient to note that, from the evidence of record, reasonable persons may fairly conclude accused's pretrial confessions were not improperly obtained, and that the law officer submitted the issue of voluntariness to the court-martial under correct instructions. See United States v Jones, 7 USCMA 623, 23 CMR 87.

**92**

### V

That brings us to the important question in this capital case and, in order to place the issue in proper perspective, substantial development of the facts is deemed desirable.

The evidence of record, including Kemp's pretrial statements, shows that he and Schafer were both assigned to the same unit. During the afternoon and early evening hours of the fateful night, the two were drinking in a base exchange beer tavern. In the course of the evening the pair bought and consumed four or five pitchers of beer.

The deceased, Cartwright, and one Airman Phillips—both members of another squadron on the base—were also present in the tavern that night. They, too, imbibed a similar substantial quantity of beer, and earlier on the same afternoon had, together, consumed half or two-thirds of a fifth of whisky given them by a sergeant who was celebrating his promotion.

No member of either pair, apparently, had previously known either of the other two men but, at around 7:30 p.m., Kemp and Schafer came over and seated themselves at the table occupied by Phillips and the victim. The conviviality, interspersed with some discord, continued among the four airmen and a fifth individual who joined them for a time, until around 9:30 or 9:45 o'clock, when an air policeman instructed that they drink up, as the tavern was about to close.

It is evident from the transcript that while the four were drinking, some friction arose for reasons which are not entirely discernible, but are not uncommon in drinking emporiums. As an example, accused Kemp played a record, and Cartwright remarked that he liked neither the song nor the singer. This angered the accused even to the point that he considered fighting and discussed that possibility with Schafer. However, and again not untypically, he soon lost his anger, quieted down, and as before the men continued their drinking together until about the time of the closing announcement, when they left the beer tavern.

There had been some discussion about going into the town of Wrightstown to drink and play pool but, fortunately for him, Airman Phillips decided not to go as he was not yet twenty-one and would not be permitted to drink in a bar in town. Accordingly, he took leave of the others and went to his barracks.

The accused, Cartwright and Schafer turned in a different direction as they left the beer tavern. The victim was insisting that they take a cab and go into Wrightstown to shoot pool, but accused and Schafer both agreed they did not care to do this and so informed Cartwright. While the trio were taking a shortcut through the hallway of Building 26–03, the victim again insisted they go into town and shoot pool. The accused, in his extrajudicial statements, asserted this angered him and he struck Cartwright in the face with his fist. He felt that Schafer, who was on the victim's other side, also struck him, whereupon the latter fell face first to the floor. While he lay prone, his two assailants started to kick him in the ribs and in the area of the head. The accused admitted that at the time he "was mad enough to hurt him but did not want to kill him." After they stopped kicking Cartwright the pair relieved him of his wallet, left the building, and proceeded to their own barracks, located in the same area. In Kemp's room they discussed what they had done and accused observed to Schafer that if Cartwright told on them they would go to jail. Accused thereupon suggested that the two go back and kill him.

In preparation, they changed clothes, Schafer was given a screwdriver by accused, and the latter had a knife. Thus armed, they returned to the corridor of the building where the victim lay, rolled him over onto his back, and accused began to stab him in the chest with his knife. In his extrajudicial statements accused admitted he stabbed him some five or six times trying to hit his heart. In the meantime, according to Kemp, Schafer was stabbing Cartwright in the vicinity of the left side of his face and temple with the screwdriver. Then they again kicked the victim's supine body until Cartwright ceased moaning.

Thereupon, in the belief there might be fingerprints on them, they decided they should take the deceased's clothes off. They proceeded to disrobe him completely, except for his socks and shoes, gathered all the clothing they had removed from their victim and left the building, intending to dispose of the clothes in a "Dempsey Dumpster." However, because someone alighted from a car and was walking toward the barracks, Kemp threw the clothing he was carrying onto the ground and ran into another building in the immediate area, followed by Schafer. After remaining there for a time, accused and Schafer looked out the door and noticed that the clothing was missing. They thereupon walked back through the building and went to their own nearby barracks.

As Kemp entered his barracks, he asserted another airman spoke to him, remarking that he looked as if he were drunk and should go to bed. Schafer and accused then entered the latter's room and closed the door. Kemp placed the knife and screwdriver in his locker and presently went to bed. Some thirty minutes later, shortly before midnight, one Knight came to accused's room and asked if he wanted to get something to eat. Accused dressed and went into Schafer's room to inquire whether he wanted to go with them. Schafer agreed, so the three, accompanied by some other airmen, proceeded to a diner off base. While at the diner, accused told Knight that he and Schafer had been in a fight with an airman in the mess hall and had stabbed him. Kemp asked if Knight would not help dispose of some bloodstained clothing. The latter at first stated he would have to think it over, but later informed the accused he did not want to become involved.

The party remained at the diner for approximately an hour and then returned to the base. There, Kemp and Knight watched television in the orderly room. The others, apparently, retired, but accused and Knight stayed

**93**

up until the end of the show and then went to Wrightstown for coffee at a diner.

In the meanwhile an airman had found the clothing of the deceased on the ground where it had been discarded by accused. He took the same to the air police, and as a result Cartwright's body was discovered. It was removed to the base dispensary where deceased was pronounced dead. Thereafter a search of the area was authorized, and information and evidence implicating Kemp were developed. Accordingly, air police were waiting for accused when he returned to the base at approximately 5:45 a.m., and apprehended him as he entered his quarters.

Upon his apprehension, accused was seized, either pushed or helped to sit on the floor of his room, and stripped of his clothing and searched. Thereafter he was ordered to redress, was handcuffed and taken to the Office of Special Investigations.

Only Kemp and his fellow-accused Schafer were present, of course, when deceased was beaten and subsequently when he was murdered. And neither testified on the merits at the instant trial, although Schafer was called as a witness and invoked his privilege against self-incrimination. Therefore, the only evidence as to what transpired at the time of the beating and at the time of the murder; which of the accused took what particular part therein; and who was the moving spirit in the deed must be found in the two out-of-court statements made by Kemp.

The first of these was taken the morning of his apprehension by agents of the Office of Special Investigations. It contains complete admissions to every incriminatory act necessary to a conviction of murder, after proof of the *corpus delicti*. It is two and one-half single-spaced typewritten letter-size sheets in length.

After making his first out-of-court statement accused was moved to maximum security cells maintained by the Army at nearby Fort Dix, New Jersey. Notwithstanding the possession by the Office of Special Investigations of the first statement made by the accused, he was, two days later, again questioned as to the offense and a new written confession taken from him. This new statement consists of approximately five single-spaced typewritten letter-size pages. It contains a recital of practically the identical incriminating facts contained in the first confession. The additional matter in this second and longer statement goes toward making the accused the moving spirit in the beating and killing of deceased. According to this new confession, accused, and not Schafer, suggested that the two of them do the criminal acts involved; and the accused, not Schafer, took the lead in carrying them out. As just one example, in his first statement accused had stated, unequivocally, that Schafer struck the first blow when deceased was knocked to the floor and thereafter accused struck the deceased. In the second confession the accused states he, not Schafer, struck the first blow and in the later statement he explains his first version as having been based only upon his assumptions. Significantly, both confessions conclude with the statement: "I have requested Mr. McMAHON to assist me in the dictation of this statement"—that individual being an Office of Special Investigations agent.

Some of the witnesses who, on the night in question, had observed the four airmen principally involved in this incident, were willing to state that Cartwright appeared to be intoxicated. And indeed, as to the victim, postmortem examination of the alcohol content of the brain tended to confirm that estimation. Regarding Kemp, Schafer, and Phillips, the witnesses referred to them, or to themselves, as "feeling good," "high," and other such descriptions. From the record, it would appear that if the four were not intoxicated and were only "high," they were probably high to the extent of the stratosphere. A reading of the transcript makes clear that the four were intoxicated when they left the beer tavern; that Kemp, Schafer, and Cartwright remained so as they walked to the hallway and the initial beating took place; and that the deceased's two as-

sailants were in that same condition when they returned to the scene of their crime, completed the murder of Cartwright, and stripped his dead body. The record, including the testimony of Airman Knight regarding the conduct of the airmen while at the diners, compels the conclusion that the accused was still intoxicated.

Accused Kemp's guilt of murder is nonetheless clear under this record. From the evidence it is plain that this trial, while contested on all issues, was essentially a trial to determine the degree of the offense—whether premeditated or unpremeditated murder—and the sentence to be imposed. The law officer having correctly ruled he must refuse to allow a plea of guilty on the merits so that concentration might be directed toward sentence alone in an effort to avoid capital punishment, the defense turned its attention to whether the offense committed constituted premeditated murder for which the penalty of death should be adjudged. The heart of the problem with which we are confronted in this instance is thus whether the Government ˙ may be deemed properly to have discharged its burden of proof as to premeditation.

We have a case in which four airmen were drinking together in a beer tavern. There is no evidence of any previous disagreement between Kemp and Schafer on the one hand and Cartwright and Phillips on the other. In fact, no member of either pair knew either of the other two men previous to the meeting in the beer tavern that evening. No doubt the court-martial sought a reasonable motive for such a brutal beating and subsequent murder and, in the light of this record, their burden was not an easy one. Considering all of the transactions on the night of the murder together, there appears to be no adequate and reasonable motive for accused and Schafer to strike and then kick the deceased. It was necessary for the court-martial to determine whether the decision to accomplish his death was motivated by a fear deceased would recognize and report them, or was the result of a failure or inability to premeditate.

In his post-trial review, the staff judge advocate denominated the offense as "an unnecessary and vicious one." To like effect Government appellate counsel in their brief described the crime as "a tragic, senseless, and brutal killing." Parenthetically, we note that whether such characterizations be valid or no, it is doubtful if the triers of fact are, thereby, necessarily assisted in determining whether the prosecution has discharged its burden of proof in capital premeditated cases by evidence showing either an unnecessary and vicious killing or a tragic, senseless, and brutal one. The difficulty in resolving the critical factual question in the instant case would, we suggest, be greatly reduced were the transcript of record to contain specific evidence taking the killing out of the area of senselessness and supplying stronger proof of malice, motive, and premeditation, other than unnecessary and vicious killing. We volunteer that observation to demonstrate how difficult was the issue of premeditation put to the members of the court-martial for determination.

In that connection, the task of the court members was complicated further by expert medical testimony. And it is a matter which arose in the course of eliciting that evidence that we conclude must govern our holding in the case at bar. The accused presented as witnesses for the defense Dr. Robert S. Garber, and Dr. James B. Spradley, civilian psychiatrists from Trenton, New Jersey. Dr. Garber was qualified as an expert in psychiatry by a residency of three years at the Trenton State Hospital; service for three and one-half years in the United States Army as a unit and consultant psychiatrist; and upon his release from the military and return to the hospital, service in various administrative posts, such as, clinical director and assistant medical director. In 1952, he became the superintendent of the Neuropsychiatric Institute in Princeton, New Jersey, and continued in that capacity until 1958. Further, he was shown to have been certified as a psychiatrist with the American Board of Psychiatry, and also certified by the American

Psychiatric Association and Mental Hospital Administration.

Dr. Garber testified that he examined the accused and consulted his background and record. He also considered information pertinent to accused which was received from a psychiatric board at Valley Forge Army General Hospital. The witness gave his opinion that the accused possessed a sociopathic personality and suffered from pathological intoxication upon consuming anywhere from a modest to an excessive amount of alcohol. Dr. Garber testified at length to hypothetical questions as to the condition of the accused. He completed his direct examination by stating "I don't believe any person suffering with pathological intoxication is capable of premeditation of any kind," which latter testimony was the subject of lengthy cross-examination by the prosecution.

Dr. Spradley also qualified as an expert in psychiatry. He had engaged in the practice of medicine since 1918; was certified as a specialist in psychiatry; and acted as the consultant psychiatrist with the Department of State at the Nuremberg trials. This expert testified that from his psychiatric examination of the accused, together with his history, he concluded accused to be a rather typical example of what psychiatrists refer to as a sociopathic individual. It was the doctor's opinion that during the period in which he committed the offense herein involved, accused was following a pathological type of reaction to alcohol, and at the time of the crime's perpetration he was in a mental state referred to as pathological intoxication. Further, the expert was asked:

"Would that person be able to premeditate, calculate, during that period?"

Dr. Spradley answered:

"I feel that premeditation requires reasoning, logical thinking, and in the conclusion of exercising judgment, this was not present in this boy during the period that he was reacting abnormally to alcohol."

The prosecution called as one of its expert witnesses, Major Edgar L. Cook, chief of the neuropsychiatric service at Walson Army Hospital, Fort Dix, New Jersey. In essence, his testimony is that, upon pretrial examination of the accused, he concluded he could distinguish right from wrong and adhere to the right.

Also called by the Government was a Dr. Robert Nathan, who had formerly been a member of the Medical Corps of the United States Army station at Valley Forge Army General Hospital, Pennsylvania. The doctor testified that he graduated from the medical school of the University of Illinois in 1954, had additional training and internship, served three years in psychiatry residency training, and had two years of psychiatric experience. He stated that in his opinion the accused had an asocial personality, but that although from his diagnosis accused must be considered to have had a mental defect, such was not of a nature as to have any bearing on the alleged offense. More specifically, the expert opined that accused was not psychotic and, at the time of the offense, could distinguish right from wrong. Further, the doctor stated that he found no evidence to support a diagnosis of pathological intoxication, and that accused was capable of adhering to the right.

Under cross-examination, the following inquiries were posed to Dr. Nathan and he gave these replies:

"Q. Do you concur in the record of the Board Proceedings?

"A. The diagnosis that took place at Valley Forge? Yes, I do.

"Q. Did that Board state that it was unable to determine whether the accused was capable of forming a degree of intent, willfulness, malice, premeditation called for by the nature of the offense charged?

"A. It did."

After additional cross-examination, trial counsel propounded further queries to Dr. Nathan on redirect examination. He responded as follows to these questions:

"Q. In answer to the question by the defense counsel concerning the

96

board comments that they were unable to determine whether the accused was capable of forming a degree of intent, wilfulness, malice, or premeditation called for by the offense charged, would you explain why the Board was unable to make that determination?

"A. After the patient's rights were explained to him under the UCMJ, he choose [sic] not to speak about the offense itself at the Board Proceedings.

"Q. That was the reason the Board could not make that determination, because he would not speak of the offense. Is that right?

"A. As far as I remember, yes.

"Q. Were you able to make a determination yourself in the examination?

"A. I was not.

"Q. You mean you were not on the Board?

"A. No, I was on the Board.

"Q. You mean you were on the Board, and the Board was not able to make the determination because of the reason you stated?

"A. That's right."

This brings us to the nub of the crucial problem. Appellate defense counsel assign as error the action of trial counsel in eliciting from the last-mentioned Government psychiatrist, testimony that the accused had refused to discuss the offense during the psychiatric examination and claimed his rights under Article 31 of the Uniform Code, 10 USC § 831, at that time. That this question may be considered in its proper perspective, we once again emphasize that for practical purposes the issue involved in this trial was essentially whether the accused was capable of premeditation and whether the offense constituted premeditated murder.

Congress adopted Article 31, Uniform Code of Military Justice, supra, for the express purpose of assuring to persons in the military service the full protection against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States.

Under the Fifth Amendment, a witness must explicitly claim his constitutional immunity or he will be considered to have waived it. Rogers v United States, 340 US 367, 95 L ed 344, 71 S Ct 438 (1951); United States v Monia, 317 US 424, 87 L ed 376, 63 S Ct 409 (1943). Fully conscious of the fact that a person in the military service might not know of his right to refuse to answer and thereby unwittingly waive such privilege, and of his unique position while under interrogation, Congress went much further than the Fifth Amendment. In addition to prohibiting compulsion or other improper influence or inducement, Congress spelled out the requirement in Article 31 (b) of the Code that one accused or suspected of an offense shall, before he is interrogated or a statement requested from him, be informed of the nature of the accusation and advised that he does not have to make any statement regarding the offense, and that any statement made by him may be used as evidence against him in a trial by court-martial.

The question before us is whether an accused who has claimed a right guaranteed to him, which springs from the Constitution and is expanded and implemented by statute, may have the fact that he invoked such privilege disclosed against him upon his trial. It should be remembered also that accused had defended in the instant case on the ground of his mental condition, and we must determine whether such disclosure was prejudicial as indicating that, rather than having a mental deficiency, accused was quite alert and capable of clear and sharp reasoning.

The unanimous opinion of this Court in United States v Kowert, 7 USCMA 678, 23 CMR 142, appears to be dispositive of this question. See also United States v Brooks, 12 USCMA 423, 31 CMR 9. In the first mentioned case accused was charged, *inter alia,* with wrongfully misappropriating certain monies and dishonorably failing to repay a loan, offenses to which he pleaded not guilty. The evidence indicated that, prior to trial, accused had been called in by his superior officer and questioned

about the alleged offenses after proper advice in accordance with Article 31. As that opinion indicates, the officer testified at trial that in the course of the interrogation a number of questions concerning the money and the debt were posed to accused. And the superior related to the triers of fact that accused repeatedly invoked his privilege against self-incrimination, answering variously: "I decline to answer under the provisions of Article 31, sir"; "I decline to answer"; and "I'll not answer that, sir, under provisions of Article 31."

The board of review in that case had held the evidence inadmissible, but concluded the other evidence of the accused's guilt was so compelling that the error was not prejudicial. This Court, however, ruled otherwise. Speaking through Chief Judge Quinn, we held receipt of such evidence to be prejudicially erroneous. Citing Kelley v United States, 236 F2d 746 (CA DC Cir) (1956); and United States v Grunewald, 233 F2d 556 (CA2d Cir) (1956), cert granted 352 US 866, 1 L ed 2d 74, 77 S Ct 91, the Chief Judge wrote for this Court:

> "It was apparent almost from the beginning of the trial that only one question existed in regard to the misappropriation charges. That question was the intention of the accused temporarily to deprive the squadron Red Cross fund of the $2.00 contribution by Colonel Smith and the squadron party fund of the unexpended balance of the collection. . . . [T]he accused's reliance upon his rights under Article 31 could be erroneously interpreted by the court members 'as constituting an admission of guilt.' United States v Kelly, 119 F Supp 217, 222 (D DC). Construed as admissions, the accused's statements give substantial color of criminality to what would otherwise be equivocal circumstances. Prejudice is, therefore, apparent.

> "The Government contends that, because the accused did not object at the trial to the inadmissible evidence, he cannot now complain. See United States v DeCarlo, 1 USCMA

91, 1 CMR 90. The error, however, relates to the only real issue in the case, and it would be manifestly unjust if we applied the ordinary rule of waiver. United States v Smith, 2 USCMA 121, 6 CMR 121." [7 USCMA at pages 681 and 682.]

We deem that holding applicable in the present instance. And, under the facts of this particular case, we are unable to agree with the board of review in its view that questions by defense counsel of Dr. Nathan had opened the door to the prosecution to use accused's reliance upon his constitutional and statutory rights in a manner which effectively converted the shield of constitutional and statutory defense into a sword of offense. Cf. Walder v United States, 347 US 62, 98 L ed 503, 74 S Ct 354 (1954).

That the prosecution did exactly that is made manifest by the closing argument of the prosecution. We all know that trial lawyers often hold back their most telling blows until the very last minute of argument, so they will be fresh in the minds of the jurors or members of courts-martial; the "clincher" is reserved for the peroration, when the defense has no opportunity to reply. Such is the case in the present instance, for trial counsel used this inadmissible evidence in the most effective and damaging manner conceivable. At the very end of his final argument and immediately before the law officer instructed the court, trial counsel made capital of accused's exercise of his Article 31 rights. These are the very last words of the prosecutor's argument to the court prior to findings:

> ". . . Now, what about the board, Doctor Nathan said the reason the board could not determine whether the man had specific intent at the time was because the accused did not make any remark before the board. Doctor Cook said, that's true. He realized the board had come out with that statement. When I asked him why, he was not allowed to answer the question. But I think that was answered by Doctor Nathan. Doctor Nathan, yesterday afternoon, said the accused did not make any

statement before the board. Therefore, the board could not determine—make a determination. Doctor Cook in his examination had talked with the accused and he could make a determination, and he did make that determination, and he told you what that determination was, that the accused had the capacity to intend his specific acts, and had the capacity to intend the act which he is accused of."

Plainly the admission of the evidence of accused's refusal to discuss the offense with the psychiatric board was prejudicial in that it conveyed to the court the fact that other members of the board were, because of the silence of the accused, unable to make a determination regarding his capacity to premeditate. Further, the manner in which trial counsel capitalized, in argument, upon the evidence of accused's refusal demonstrates its prejudicial character, for he asserted accused talked to Doctor Cook and the latter could and did determine accused to have the capacity to entertain a specific intent. It seems at best to be a thinly veiled implication that, had the accused discussed the offense with the board, it could, and would have determined that he had the capacity to premeditate.

The holdings of this Court that it is prejudicial error to admit evidence that accused availed himself of Article 31 are in accord with the Federal rule on self-incrimination as enunciated by the Supreme Court of the United States. Thus, in Slochower v Board of Ed. of N. Y., 350 US 551, 100 L ed 692, 76 S Ct 637 (1956), Mr. Justice Clark wrote:

". . . The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in Ullmann, a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances."

As has been previously stated herein, Article 31 preserves to the accused before a court-martial the full benefits of the Fifth Amendment and extends and enlarges the benefits of that Constitutional safeguard. For a discussion by the Supreme Court of the United States of the nature of the Fifth Amendment and the spirit in which its privilege should be approached, see Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956).

In similar vein, Mr. Justice Harlan stated in Grunewald v United States, 353 US 391, 424, 1 L ed 2d 931, 77 S Ct 963 (1957):

". . . On the other hand, the danger that the jury made impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible. . . .

"We hold that under the circumstances of this case it was prejudicial error for the trial judge to permit cross-examination of petitioner on his plea of the Fifth Amendment privilege before the grand jury. . . ."

And Mr. Justice Black, joined by the Chief Justice and Justices Douglas and Brennan, observed in a concurring opinion in *Grunewald*:

". . . I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them.

"It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution." [353 US at pages 425 and 426.]

See also Konigsberg v State Bar of California, 353 US 252, 1 L ed 2d 810, 77 S Ct 722 (1957).

Even as long ago as 1886, Mr. Justice Bradley, speaking of the Fourth

and Fifth Amendments to the Constitution, wrote in Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524:

". . . It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

As was succinctly stated in McKnight v United States, 115 Fed 972 (CA 6th Cir) (1902):

"A perusal of the decisions of the supreme court shows that no constitutional right has been the subject of more jealous care than that which protects one accused of crime from being compelled to give testimony against himself. The right to such protection existed at the common law, and was carried into the constitution, that the citizen might be forever protected from inquisitorial proceedings compelling him to bear testimony against himself of acts which might subject him to punishment."

We echo Justice Harlan's warning, quoted earlier, that "the danger . . . of . . . equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible." We know that currently great resentment has grown up in our country against what is regarded as flagrant abuse of the right to refuse to answer under the Fifth Amendment. As shown in *Slochower,* supra, laws have been passed to remove from public employment, *ipso facto,* one invoking its protection. No one need have admiration for the individual who has

so conducted himself as to find it necessary to seek this protection. Especially is this true when the question involves loyalty to our own form of government. Naturally, resentment exists in patriotic and sincere people. The danger lies in the fact that this resentment extends to all persons refusing to answer questions on all subjects. It, therefore, behooves those prosecuting capital cases, and reviewers in passing thereon, to make positive that no such consideration entered into the determination that an accused must forfeit his life.

The action of trial counsel in developing the fact that accused had claimed the protection of Article 31 was highly prejudicial to the accused. It had a direct bearing on the only substantial issue in the case and requires reversal of his conviction for premeditated murder.

The decision of the board of review is reversed. The record will be returned to The Judge Advocate General of the Air Force for reference to the board of review, which may affirm a finding of unpremeditated murder and an appropriate sentence or order a rehearing. See United States v Kunak, 5 USCMA 346, 17 CMR 346; United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67; United States v Walker, 7 USCMA 669, 23 CMR 133.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

In all matters but one I agree with the principal opinion. As to the exception, I agree with the conclusion reached by the board of review below that the accused himself opened the door to the admission of evidence of his silence before the psychiatric board at the Valley Forge Hospital.

By means of leading questions on cross-examination, defense counsel elicited from Dr. Nathan, a Government witness, an admission that he and other members of the medical board were "unable to determine" the accused's ability to premeditate. Defense counsel did not ask the witness the reason for the medical board's inability to make

that determination. Standing by themselves, the form of defense counsel's questions and the witness' responses left the definite impression that the medical board had actually examined the accused, and could not make the vital finding as to his ability to premeditate because the facts disclosed by the examination left the matter shrouded in doubt. But that was not the truth. The real fact was that the medical board had never actually been in a position to evaluate the accused. It could not reach a decision only because the accused refused to submit to examination. Thus, the questions and answers represented a gross distortion of the real facts. In my opinion, the Government was entitled to correct the distortion and to bring out the true reason for the medical board's inability to reach a finding. United States v Shaw, 9 USCMA 267, 26 CMR 47; Lee v State, 342 SW2d 753 (Texas).

The situation in the *Shaw* case, supra, is substantially similar to that present here. There the defense introduced a stipulation of expected testimony. According to the stipulation, a civilian psychiatrist examined the accused. In the course of the examination the doctor was informed by the accused that he could not recall what had happened during the series of events that led to the charges against him. The doctor concluded there was "a question whether . . . [the accused] knew right from wrong" as to the offenses charged. In rebuttal the Government called a Navy neuropsychiatrist. He testified he had examined the accused after the offenses, and the accused related to him many of the details of the acts. He also testified that the accused's ability to recall and recount these details was inconsistent with the amnesic condition reported by the accused to the civilian psychiatrist. We sustained the admissibility of this rebuttal evidence on the ground the accused by his own act made admissible that which would otherwise be inadmissible.

Moreover, the circumstances of this case are materially different from those in United States v Kowert, 7 USCMA 678, 23 CMR 142, which is cited by my

brothers as authority for reversal. In the *Kowert* case, the prosecuting attorney, as part of the Government's case, repeatedly asked a witness about the accused's reliance upon his right to remain silent. The testimony was entirely unrelated to any matters raised by the defense. Here, the reference to accused's silence was essential to correct a wholly false impression injected into the case by the defense counsel. In Walder v United States, 347 US 62, 98 L ed 503, 74 S Ct 354 (1954), the United States Supreme Court held that a defendant who testifies falsely can be impeached by evidence obtained as a result of a constitutionally unlawful search. It said:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment.

". . . Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

True, there is here no direct perjurious testimony by the accused. But defense counsel's cross-examination of Dr. Nathan intentionally created the premise for a false material conclusion. In my opinion, there is as little justification to permit indirect falsity as there is to sanction direct perjury.

See United States v Beatty, 10 USCMA 311, 314, 27 CMR 385.

I would affirm the decision of the board of review.