UNITED STATES, Appellee

v

GARFIELD WHITAKER, JUNIOR, Private First Class, U. S. Army, Appellant

13 USCMA 341, 32 CMR 341

No. 16,029

November 16, 1962

First Lieutenant Gary G. Keltner argued the cause for Appellant, Accused. With him on the brief were Lieutenant Colonel Ralph Herrod, Captain Richard A. Baenen, and Captain David M. Gill.

■■■■■■■■■■

*Captain Harvey L. Zuckman* argued the cause for Appellee, United States. With him on the brief were *Major Francis M. Cooper* and *Captain Alvin B. Fox.*

## Opinion of the Court

KILDAY, Judge:

Tried by general court-martial for several offenses, accused pleaded guilty to, and was convicted of, attempted housebreaking and false swearing, in violation of Articles 80 and 134, Uniform Code of Military Justice, 10 USC §§ 880 and 934, respectively. Contrary to his plea of not guilty thereto, he was also convicted of willfully damaging military property, violative of Article 108 of the Code, 10 USC § 908. The court acquitted accused of a mail offense and, after consideration of evidence in extenuation and mitigation, imposed a sentence of bad-conduct discharge, forfeiture of $10.00 per month for ten months, and confinement at hard labor for one year. The findings and punishment having been affirmed by intermediate appellate authorities, accused thereafter petitioned this Court for grant of review. We elected to hear argument on a single issue relating to the alleged crime of false swearing. Specifically, the question before us is whether, under the circumstances, the accused's admitted conduct, as alleged in the specification, constitutes the last-mentioned offense.

A short recitation of facts should suffice to put the issue in focus. After midnight, on the day in question, it was discovered that someone had attempted to break into the post office at Valley Forge General Hospital. An investigation developed strong evidence incriminating accused. Consequently, he was, later that same day, interrogated by a military police investigator. After inquiry regarding these highly suspicious circumstances, the agent posed the following question:

"Did you attempt to break into the Post Office, Valley Forge General Hospital during the period 13–14 July 1961."

Accused responded:

"No."

Having been put under oath by the investigator pursuant to the authority conferred by Article 136(b)(4), Uniform Code of Military Justice, 10 USC § 936, accused swore and subscribed to the entire statement.

The above-quoted question and answer were made the basis for the alleged offense of false swearing when accused subsequently, in another pretrial interview, admitted he had falsified. And, in his testimony at trial, accused candidly conceded having answered falsely—as previously noted, he pleaded guilty to both attempted housebreaking and false swearing.

Thus, there is no quarrel over the essential facts. Beyond question the military police investigator ■■■■■■■■ was duly designated as such and, in the course of his assignment to this case, was engaged in inquiring into the matter. It is also undisputed that accused, having been sworn by the agent, lied. Accused frankly admits this. As Article 136(b)(4) of the Uniform Code, supra, provides that all persons on active duty who are detailed to conduct investigations "may administer oaths necessary in the performance of their duties," the question before us narrows to whether the criminal investigator overstepped his mark in administering the oath. We are urged to hold that he did and to overturn or modify this Court's decision in United States v Claypool, 10 USCMA 302, 27 CMR 376. We decline to do so.

In the last-mentioned case, which came to us by certificate, the board of review had held that, in the absence of a specific Congressional requirement or authorization that investigators administer an oath to a suspect, the accused's conviction for false swearing must be overturned. We, of course, rejected that reasoning, pointing out that when a general authority is granted to administer oaths, such authority—in the absence of express or implied lim-

itations as to who may be sworn—extends to all persons amenable to military discipline.

In the case at bar the real thrust of the defense position is directed against *Claypool*. Appellate defense counsel concede, as they must, that the offense of false swearing is well recognized in military law. See United States v Smith, 9 USCMA 236, 26 CMR 16. Likewise, the defense seems to agree that the oath need not be *required* by law. In false swearing, as in perjury— with other differences not here material—it is sufficient if the oath be administered, in a matter in which an oath be either required *or authorized* by law, and by a person with authority to administer such oath. See paragraphs 210 and 213*d*(4), Manual for Courts-Martial, United States, 1951. Additionally, it would appear—at least at first blush—that counsel for accused are willing to accept the previous holding by this Court that an investigator, even in the absence of a specific requirement that he swear a given individual, still possesses authority to administer oaths.

However, any real concession that an oath need not actually be required by law in a false swearing case of the type here before us is strictly illusory. Looking to the language of Article 136(b) (4), supra, the defense asserts that it was, in the case at bar, unnecessary that the agent swear accused to accomplish his duties. The term "necessary,". it is contended, is equivalent with outright essentiality and strict necessity. Thus, the argument proceeds, unless the investigator was required to administer the oath to perform his duty, he was without authority to do so. Manifestly, that interpretation differs from that announced by the Court in *Claypool*, supra. Reduced to its essentials, the defense argument is really no different than the board of review reasoning rejected by us in that case. By this exercise in circumlocution the defense would, by indirection, have us alter the military offense of false swearing, and limit its application to situations where an agent was specifically authorized and required to administer an oath to a suspect, as opposed to instances in which

an oath is simply authorized by law. We know of no situation where an agent is required to administer oaths. Indeed, had the Congress, in its wisdom, intended so to limit an investigator's authority, it could have been simply accomplished by use of language conferring a narrow and specific authority in lieu of the general power vested by the words in fact employed in the statute.

The enactment purports to bestow authority to administer oaths upon investigators, yet nowhere requires such an agent to put specified individuals under oath. Under those circumstances we are wholly unwilling, under the pretext of legal review, to indulge in judicial legislation and construe the word necessary so strictly as to deny to investigators the oath-taking authority. But if an oath is "necessary" only when required, that would be the result. Certainly we cannot ascribe such a tortured meaning to a solemn Act of Congress.

To the contrary, we believe the meaning we ascribed to the term in *Claypool* to be correct. And, indeed, such meaning is entirely consistent with the following common and accepted definition found in Webster's New International Dictionary, Unabridged, 2d ed, page 1635:

"Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency, or the like. . . ."

See also Black's Law Dictionary, 4th ed, page 1181. It should be borne in mind that an investigator's function is not merely to solve crime, but to determine truth—from suspects and innocent witnesses alike. Moreover, his responsibility includes compilation of such evidence as he uncovers in such manner as will foster and expedite further proceedings dictated by the circumstances. With specific reference to criminal matters, and quite apart from other important preliminary steps, there can be little doubt that an Article 32 pretrial hearing may be frustrated if a criminal investigator has not obtained statements from his witnesses under oath. See United States v Samuels, 10 USCMA 206, 27 CMR 280.

Thus it is clearly "essential to a desirable end" for a criminal investigator to swear witnesses, and dispensing with the oath may indeed be at the cost of "inefficiency, or the like." Accordingly, we conclude the military policeman did not overstep his authority to administer oaths "necessary" in the performance of his duty.

Ordinarily, we might appropriately conclude our inquiry at this point. Another suggestion has been raised, however, which we deem it expedient to lay to rest. We are importuned to carve out a separate niche for cases such as that presently before us on the grounds that it was the accused—at that time the sole and prime suspect—who was interrogated by the agent, and that the question posed to him confronted him with a dilemma requiring him either to confess his guilt of a criminal offense; to lie; else, according to appellate defense counsel, to create further suspicion by exercising his right to remain silent. We must decline to accept the invitation.

In that connection, we pause briefly to consider appellate defense counsel's complaint regarding the investigator's alleged motives. They assert that his action placing accused under oath constituted "quasi-entrapment," urging that the agent's sole purpose at that point was to have accused lie under oath and thereby make himself liable on yet another offense—the one here involved, false swearing. We simply point out that this accusatory finger is leveled by the defense at the criminal investigator when he has no opportunity to speak in his own behalf. The matter is raised for the first time on appeal. It was not litigated at trial—

the proper forum for airing such disputes—as accused there, for reasons wholly satisfactory to him, chose voluntarily to plead guilty. In United States v Claypool several valid reasons for investigators taking statements under oath, including statements by an accused, were advanced. Accordingly, even were we to assume the assertion of "quasi-entrapment" to be relevant to the issue, we must properly refuse to impute impure motive to the military policeman on the basis of the instant untimely and unsubstantiated allegation.

Nonetheless, and apart from the motives of the investigator, we are undeterred from our conclusion by the fact that here the accused was a chief suspect in another offense at the time he gave the answers resulting in his conviction for false swearing. That same condition existed both in United States v Claypool, supra, and—for practical purposes—in United States v Gomes, 3 USCMA 232, 11 CMR 232,[1] yet we affirmed in both instances. So, too, we are unimpressed by the fact that the agent asked accused whether he had unlawfully attempted to enter the post office. No valid distinction can be drawn on the basis that an affirmative answer by accused to the question posed would constitute a confession by him to a separate offense. Again, the same thing was true in both the aforecited cases.[2] Indeed, that very argument was rejected in United States v Gomes, where we expressly declined to hold that falsification could not constitute an offense when it was merely denial of another crime. 3 USCMA at pages 235 and 236.

True it is that one who has com-

[1] We are fully cognizant, of course, that Gomes was tried under a precursor to the present Article 133, Uniform Code of Military Justice, 10 USC § 933. It is to be noted, however, that one of his offenses involved false answers under oath. This Court equated the same to false swearing, and, indeed, invoked the rule, applicable both to the latter crime and perjury, that the uncorroborated testimony of but a single witness would be insufficient to establish the falsity involved. See Manual for Courts-Martial, United States, 1951, paragraphs 210 and 213d(4).

[2] The questions put to Claypool inquired whether he had received money on account of arranging the services of prostitutes for fellow soldiers. Gomes denied, to agents of the Federal Bureau of Investigation, having solicited or received from license applicants, a valuable consideration in exchange for which he assured them passing grades in the examinations he was responsible for conducting.

mitted offenses, regarding which inquiry is being made, is under tremendous psychological pressure. We suggest, however, that the proximate causation of such "dilemma" is his own prior misconduct, and not the interrogation as such. We see no valid reason to allow suspects to so lightly regard the sanctity of a solemn oath that, having been sworn, they may deliberately lie with impunity. Particularly is this so when Article 31, Uniform Code of Military Justice, 10 USC § 831, clothes them with rights even broader than the Fifth Amendment to the United States Constitution. Not only are suspects protected against self-incrimination, they need make no statement whatever. And, it is to be remembered, the fact that they choose to exercise the prerogative of silence may not be used as evidence against them. See United States v Kowert, 7 USCMA 678, 23 CMR 142; United States v Kemp, 13 USCMA 89, 32 CMR 89.

We suggest our attitude is not at all novel. As was said in United States v Thomas, 49 F Supp 547 (WD Ky), in an analogous situation:

".  .  . The Fifth Amendment may at times excuse a witness from testifying, but when testimony is properly received it is not a protection against the charge of perjury."

We are not unmindful that in the past it has been considered inappropriate in the Navy and Coast Guard to prefer a charge of falsehood against a person for denying guilt as to some other crime. Indeed, we confess to substantial sympathy for such position. Nonetheless, it is to be borne in mind that the gravamen of the offense with which we are here concerned lies not so much in falsity alone as in the disregard and violation of a solemn oath. Were we concerned simply with a false answer where the contravention of an oath was not charged, different considerations would be involved. See United States v Aronson, 8 USCMA 525, 25 CMR 29, and allied cases. See also United States v Philippe, 173 F Supp 582 (SD NY) (1959); and compare Article 107, Uniform Code of Military Justice, 10 USC § 907, with section 1001 of Title 18,

United States Code.   Here, however, being under no duty whatever to speak at all, accused chose to do so. Thereby, he contravened his sworn attestation of truthfulness, and laid himself open to the instant charge. The desirability, as a policy matter, of prosecuting such offenses is the concern of other authority and beyond our province. While we are of the mind that those in the position to do so should consider carefully whether to try such a case, it is clear, in view of prior holdings in this area, that the question raised in the present instance is not an open one in this Court. There is no legal impediment to preserving the sanctity of an oath by an affirmance of the instant conviction.

For the above-stated reasons, and those set forth in United States v Claypool, supra, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

"When I use a word," Humpty-Dumpty said, "It means just what I choose it to mean—neither more nor less."[3] My brothers might well cite this fabulous individual in supporting their rationale, for it is precisely the sort of reasoning which they employ in construing Uniform Code of Military Justice, Article 136, 10 USC § 936. Thus, in defiance of Webster, the English language, and the intelligence of our legislature, it is found that Congress by using the word "necessary" meant "desirable" and, under the terms of the mentioned enactment, conferred the oath-giving power upon every military policeman in all the armed services who is conducting an investigation. If, as they state, the essence of the offense charged is the protection of the sanctity of an oath, then I suggest that this broad reading of Code, supra, Article 136, is plainly wrong, for to permit its administration by any private soldier acting as a military policeman is simply to eliminate the importance accorded an attestation.

[3] Carroll, Through the Looking Glass and What Alice Found There, Chapter VI.

As we are confronted with a guilty plea to the offense of false swearing, in violation of Code, supra, Article 134, 10 USC § 934, and have granted the petition for review only on the issue whether accused's admittedly false denial of guilt under oath to a military police investigator constituted that offense, the real question before us is whether such investigator is authorized by the terms of Code, supra, Article 136, to administer the requisite oath.

The statute in question provides:

"(b) The following persons on active duty may administer oaths *necessary in the performance of their duties:*

. . . . . .

"4. All persons *detailed to conduct an investigation.*" [Code, supra, Article 136.] [Emphasis supplied.]

It seems clear that the key to the controversy before us is the meaning of the words "necessary" and "detailed" as used by Congress in the quoted Act. And it seems equally apparent that they should be accorded their ordinary definitions. As we said in United States v Dickenson, 6 USCMA 438, 20 CMR 154, at page 449:

". . . If the words used in the statute convey a clear and definite meaning, a court has no right to look for or to impose a different meaning. It is clearly and forcefully set out in 50 Am Jur, Statutes, § 225, page 207, that 'a plain and unambiguous statute is to be applied, and *not interpreted,* since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and tends only to obscurity.' "

Turning to the first portion of the statute in question, we find that Congress has expressly limited the oath-giving power to situations in which oaths are *"necessary* in the performance of their duties." (Emphasis supplied.) "Necessary" is not a term involving subtle nuances of meaning. It is unqualifiedly defined as *"essential* to a desirable or projected end or condition; *not to be dispensed with* without loss, damage, inefficiency, or the like," (emphasis supplied) Webster's New International Dictionary, Unabridged, 2d ed, page 1635; or "[b]eing such in its nature or conditions that it must exist, occur, or be true; inevitable . . . [a]bsolutely needed to accomplish a desired result; essential; requisite, formerly said of persons rendering useful services . . . [c]ompulsory; as, a *necessary* action . . . [b]eing such that it must be believed . . . [t]hat which is indispensable; an essential requisite . . . [t]hat which is subject to the law of necessity" (Funk & Wagnalls New Practical Standard Dictionary of the English Language, Vol. One, 1956 ed; Britannica World Language Dictionary, page 885). And in the case of the ordinary police investigation—as is involved here—it cannot be logically found that an oath is *essential* to the solution of the alleged crime. True, officers may find it *desirable* as an aid in obtaining accurate information, but that is not the qualifying term which Congress used. Rather, as noted above, it restricted the authority so to administer oaths to situations of *necessity,* and, indeed, in delineating the classes of persons authorized to administer them, specifically said that persons conducting investigations should have only limited authority because it was desirable to avoid the drastic consequences which might ensue if persons lacking legal experience or proficiency in personnel matters were given the general powers of a notary public. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1236; House Report No. 491, 81st Congress, 1st Session, page 36; Senate Report No. 486, 81st Congress, 1st Session, page 33.

Moreover, were it thought *necessary* for an ordinary policeman to have the authority to place suspects and witnesses under oath, the power to swear them would have long ago been conferred upon them all over our Nation. Yet, the statute books of most jurisdictions are silent on the question. Indeed, one Federal judge has declared—with respect to a prosecution for making a false statement to a Federal officer—that:

". . . While the Special Agent may have been disappointed that de-

fendant would not truthfully answer himself into a felony conviction, we fail to see that his investigative function was in any way perverted. *The only possible effect of exculpatory denials however false, received from a suspect such as defendant is to stimulate the agent to carry out his function. It would be strange to expect that the agent would accept defendant's denials and conclude that his investigation should be closed."* [United States v Philippe, 173 F Supp 582 (SD NY) (1959).] [Emphasis supplied.]

That is precisely what occurred here, for the record reflects that the military police were undeterred by accused's sworn denial of guilt and proceeded to build against him such a damning case that he entered a plea of guilty to the offense which he had falsely stated he did not commit.

In addition to converting the word "necessary" to "desirable," I believe this ill-construes the meaning of another limitation placed by the Congress in Code, supra, Article 136. Having limited temporary oath-giving authority to situations of necessity, Congress also provided that it would be granted under the particular subsection of the statute only to those persons *"detailed* to conduct an investigation." (Emphasis supplied.) Once more, we find the legislative arm using a term having a commonly accepted definition in military law. Thus Webster's New International Dictionary, Unabridged, 3d ed, at page 616, notes its meaning as "to assign (a person, a military unit) to a particular task [the first sergeant will —the platoons for fatigue duty] [an infantry officer—*ed* to an air-force unit during manuevers]." And Bouvier states its definition as:

"One who belongs to the army, but is only detached, or set apart, for the time to some particular duty or service, and who is liable at any time, to be recalled to his place in the ranks." [1 Bouvier's Law Dictionary, 3d Rev, Detail, page 856.]

See also, to the same effect, Black's Law Dictionary, 4th ed, Detail, page 535, and 12 Words and Phrases (Perm ed), Detail, page 456.

It would seem, therefore, that Congress, in enacting Code, supra, Article 136(b)(4), had in mind conferring the temporary authority to administer oaths *necessary* in the performance of their duties upon those persons who have been specifically set apart by the military to conduct a particular investigation as, for example, in the case of an officer detailed to conduct a pretrial investigation under Code, supra, Article 32, 10 USC § 832. Cf. United States v Samuels, 10 USCMA 206, 27 CMR 280. Numerous other instances may be cited, including persons appointed to administrative boards of inquiry, to conduct line of duty investigations, to investigate claims against the United States, or to file reports of survey.

All of these considerations augur but one conclusion, and that is that Congress never intended by Code, supra, Article 136 (b) (4), to confer generally upon military policemen the authority to ˙administer oaths. The phrasing of the statute clearly so indicates. United States v Dickenson, supra. Military police are not "detailed" to conduct investigations. That is their ordinary function, performed "in the ranks," and there is no need to select them out and assign them to what is no more than a routine task for their branch. Moreover, even apart from and above this consideration is the need to accord proper definition to the term "necessary" and the fact that it simply does not and cannot mean "desirable."

On what foundation, then, do my brothers erect the edifice of their reasoning concerning this detective's power to swear this accused? Reliance is placed upon United States v Claypool, 10 USCMA 302, 27 CMR 376. But we granted accused's petition to re-examine the holding in that case, and I suggest that the majority may find small comfort in merely parroting its reasoning. The other principal authority cited is United States v Gomes, 3 USCMA 232, 11 CMR 232. The *Gomes* decision, however, is not at all in point. It involved the making of a false statement under oath to an agent of the Federal Bureau

of Investigation, charged as conduct unbecoming an officer and gentleman, in violation of the laws then governing the United States Coast Guard. The statement was made to the special agent after the accused was sworn and had been advised both of the agent's authority to administer the oath and his right to refuse to take it. Most importantly, the agent had, as noted by the Chief Judge, *specific statutory authority to swear Commander Gomes to the truth of his declarations.*

That is precisely the issue before us, *i. e.,* whether the military police invesigator here involved had such power, and I respectfully suggest that it begs the question so to use the *Gomes* case, resting as it does upon an entirely different statutory premise.

In sum, then, I would conclude that Code, supra, Article 136(b)(4), does not confer authority upon military police to administer oaths to witnesses or suspects whom they interrogate and that, necessarily, accused's conviction of false swearing must fall. I believe my brothers' conclusion to the contrary is unreal in light of the plain and unambiguous words of the Article in question. I regret that they have seen fit to continue the erroneous course upon which the Court embarked in United States v Claypool, supra, for I cannot bring myself to believe that it is even desirable to confer upon all police an authority which Congress most certainly did not envision. I accordingly record my dissident views.

I would reverse the decision of the board of review, order the charge of false swearing dismissed, and return the record of trial for reassessment of the sentence.