UNITED STATES, Appellee

v

ARTHUR E. BROOKS, First Lieutenant,

U. S. Army, Appellant

12 USCMA 423, 31 CMR 9

No. 14,831

June 30, 1961

*Lieutenant Colonel Ralph W. Wofford* argued the cause for Appellant, Accused. With him on the brief was *Colonel Harley A. Lanning*.

*First Lieutenant James Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. Mc-Conaughy*.

## Opinion

HOMER FERGUSON, Judge:

Tried by general court-martial upon a charge of attempted rape, in violation of Uniform Code of Military Justice,

Article 80, 10 USC § 880, the accused was found guilty of indecent assault, in violation of Article 134, 10 USC § 934. He was sentenced to dismissal, forfeiture of all pay and allowances, and confinement at hard labor for one year. The convening authority approved the sentence but suspended that portion relating to confinement. The board of review affirmed, and we granted accused's petition for review on the question whether the accused was prejudiced by receipt of testimony that he refused to make a pretrial statement concerning the charge against him and the trial counsel's cross-examination of him regarding the reasons for his silence during the investigation.

From the record, it appears that the accused and a friend, en route to a gasthaus, picked up the victim and another girl on the streets of Neu-Ulm, Germany. The friend left the party at the gasthaus, and the accused proceeded to drive the two girls home. The victim's companion was safely delivered to her place of abode, and the accused proceeded to the village of Senden, where the victim resided. From this point on, the evidence is in marked conflict. According to the victim, the accused refused to stop at her home, struck her twice, and proceeded to drive rapidly into the neighboring countryside. After parking on a dirt road, he forcibly disrobed her, struck her, and choked her. She finally succeeded in escaping from the car and, almost completely nude, ran to a nearby mill where she obtained shelter until the following morning. Her testimony was corroborated in part by that of a woman who permitted her to enter the mill and the presence on her body of several scratches and bruises.

On the other hand, the accused, admitting that he picked up the victim and offered to drive her home, testified that she made sexual advances to him while on the way to Senden and agreed "to go out and park someplace." After reaching the scene of the alleged incident, the parties engaged in further intimacies, and the victim proposed that the accused have intercourse with her in return for a payment of twenty marks. Accused agreed and paid her the money. She partially disrobed, and the accused observed that she was menstruating. He became disgusted and asked for the return of his money, which the victim had placed in her brassiere. She refused to return it, and the accused ripped off her sweater and brassiere in order to secure the mark notes. The victim slapped him, and he struck her two or three times. He then let her out of the car and threw her clothes after her.

In support of his version, accused introduced evidence of his own outstanding reputation for moral character and truth and veracity. In addition, it was shown that the victim initially opposed any report of the matter to the police. Finally, her reputation as a prostitute, former commitment to a reformatory, and infection with venereal disease was demonstrated by the testimony of the local police chief and two police officers. On cross-examination, the victim admitted frequently engaging in promiscuous conduct but denied that her transactions had any commercial aspects.

During the trial, two agents of an Army Criminal Investigation Detachment were called as witnesses. Chief Warrant Officer Britt testified that he advised the accused of his rights under Code, supra, Article 31, 10 USC § 831, and informed him of the nature of the offense of which he was suspected. Accused became visibly upset and "at that time he told me he did not wish to talk about it any more."

Chief Warrant Officer Butler also testified that he interrogated the accused after complying with the preliminaries required by the Code. In response to his questions, accused replied that "he didn't wish to make a statement." On objection by defense counsel, that portion of Butler's testimony was stricken from the record and the court was instructed to disregard it as evidence against the accused. Similar action was taken by the law officer when the witness again testified that accused refused to make any statement and that he had been requested to submit to a polygraph examination.

Following accused's testimony in his

424

own behalf, he was extensively cross-examined by the trial counsel. The part thereof which leads to our review is as follows:

"Q. You stated you didn't make a statement—it has been testified you didn't make a statement—is this correct?

"A. Yes, sir.

"DC: I object to that question. The prosecution knows very well it is inadmissible—any reference to statements.

"TC: I don't know where the defense counsel gets his idea Mr. Law Officer. Mr. Britt sat here, yesterday afternoon, before he got around to objecting to anything about statements, and said 'I asked him if he cared to make a statement and he said "No"', and when Mr. Butler got up here about the statement defense counsel got around to objecting to the question on the statement. It has come into testimony that the man refused to make a statement and evidently counsel didn't catch it when it came in on the second time.

"DC: Sir, the record would only prove what is right. I made my objection at the time Mr. Britt referred to the statement. Counsel seems to be a little confused.

"LO: I believe the objection was made at the time Mr. Butler testified and I believe this was the second time Mr. Butler had testified that the objection was made. In other words, Mr. Britt said that; also Mr. Butler's testimony. As to the two previous occasions, would you wish to object now?

"DC: I certainly do, sir, as to reference to any statement.

"LO: Very well. Any testimony that has come before the court about the accused refusing to make a statement is stricken from the record. The court is instructed it may not consider such evidence against the accused.

"Questions by prosecution (continued):

"Q. But you were interrogated by the CID investigating officers, were you not?

"A. Yes, sir.

"Q. Did you make any attempt to explain your whereabouts on the previous evening?

"A. No, sir.

"Q. Why not?

"DC: Object again—there is no necessity—

"TC: By now he has testified on the merits and I'll ask this question.

"DC: My objection still stands, sir.

"TC: He has opened himself up for anything now.

"LO: Overruled.

"Questions by prosecution (continued):

"A. I did not say anything because I was within my rights not to say anything.

"Q. Isn't it possible a little explanation would have solved the whole thing—that you were out with a prostitute—

"DC: Again, I object. Any accused—he is under no obligation to make any statement to anybody. The prosecution is well aware of this and he insists that the witness now explain why he refused to make a statement.

"TC: When this witness gets on the witness stand and testifies on the merits I can ask him any questions —that remove any privileges he had under Article 31—they have gone. If he wanted to claim Article 31 he should have stayed off the witness stand.

"LO: I will overrule the objection. However, the court is instructed that the privilege against refusing to make a statement or testifying, of course, is a right granted by the Constitution and under Article 31 and that fact alone may not be considered as evidence against the accused.

"Continue."

It has long been settled that an ac-

cused's pretrial reliance upon his rights under Code, supra, Article 31, when interrogated concerning an offense of which he is suspected, may not be paraded before a court-martial in order that his guilt may be inferred from his refusal to comment on the charges against him. In United States v Armstrong, 4 USCMA 248, 15 CMR 248, at page 252, the late Judge Brosman stated, for a unanimous Court:

"... The Government has attempted to rely on this conduct as constituting an admission by silence. Yet in this connection, the Manual for Courts-Martial emphasizes that 'Mere silence on the part of an accused when questioned as to his supposed offense is not to be treated as a confession.' Paragraph 140a. *Indeed any other rule would violate the manifest policy of Article 31 of the Code, supra, for—if incriminated by reliance on his right to remain silent —an accused would indirectly. be compelled to speak.*" [Emphasis supplied.]

In United States v Kowert, 7 USCMA 678, 23 CMR 142, we again unanimously ordered a rehearing for the receipt of evidence that the accused relied upon his rights under Code, supra, Article 31, when questioned by an investigating officer. Similar action was taken *per curiam* in United States v Bayes, 11 USCMA 767, 29 CMR 583. Cf. United States v Bolden, 11 USCMA 132, 28 CMR 406.

With respect to the cross-examination of an accused who elects to testify in his own behalf, it is clear that the same rule applies. In Grunewald v United States, 353 US 391, 1 L ed 2d 931, 77 S Ct 963 (1957), co-defendant Halperin was questioned by the prosecution concerning whether he had elected to rely upon his constitutional privilege to remain silent when interrogated before the grand jury. Distinguishing Raffel v United States, 271 US 494, 70 L ed 1054, 46 S Ct 566 (1926), the Court held such cross-examination impermissible and prejudicial, despite an instruction to the jury that no inference of defendant's guilt could be

**426**

drawn from his prior reliance upon the Fifth Amendment. Speaking for the Court, Mr. Justice Harlan noted:

"We need not tarry long to reiterate our view that, as the two courts below held, no implication of guilt could be drawn from Halperin's invocation of his Fifth Amendment privilege before the grand jury. Recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew that one of the basic functions of the privilege is to protect *innocent* men . . . 'Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' Ullmann v United States, 350 US 422, 426, 76 S Ct 497, 500, 100 L Ed 511." [353 US at page 421.]

More recently, in Stewart v United States, 366 US 1, 6 L ed 2d 84, 81 S Ct 941 (1961), the Supreme Court was faced with a situation almost identical to that now before us. There, the defendant, Stewart, took the stand in his own behalf after remaining silent in two prior trials upon the same indictment. On cross-examination, the prosecutor asked Stewart if this was not the first time he had elected to testify. The accused responded with gibberish as he had to other questions placed to him. A defense motion for a mistrial was denied upon the Government's representation that the jury was entitled to know of accused's prior silence. The Court held that the prior decisions to remain silent were not at all inconsistent with the defendant's election now to testify and the statements which he now made. Reversal was necessitated by the probable effect of the point upon the jury.

From the foregoing, it will be seen that we are compelled to reject the United States' contention that no prejudicial error was committed in receiving testimony from the criminal investigators concerning accused's pretrial reliance upon his Article 31 rights and in permitting the trial counsel to cross-

examine him on the same subject. United States v Kowert, supra; United States v Armstrong, supra; Grunewald v United States, supra; Stewart v United States, supra. With respect to the question of prejudice, it is clear that a substantial factual question existed concerning whether the accused assaulted the victim with intent to gratify his lust or to obtain the return of the twenty marks which he allegedly gave her. There was support for his version of the incident as well as hers, and under the circumstances, there is a fair risk that the court members threw into the balance the fact of his pretrial silence despite the contrary instruction of the law officer. Grunewald v United States, supra. As was stated in United States v Grant, 10 USCMA 585, 28 CMR 151, with respect to certain inadmissible testimony which had been stricken, at page 590:

". . . It is difficult to see how the members could erase from their minds the damning effect of Colonel Flemming's vituperative declarations and accord to the accused the fair trial to which he is entitled. As was succinctly stated in People v Deal, 357 Ill 634, 192 NE 649 (1934), at page 652:

'. . . Human nature does not change merely because it is found in the jury box. The human mind is not a slate, from which can be wiped out, at the will and instruction of another, ideas and thoughts written thereon.' "

Indeed, we are at a loss to understand why the law officer overruled the defense counsel's objection and permitted the cross-examination and, at the same time, instructed the court-martial to disregard the sole inference which could be drawn from the questions and answers. See United States v Bolden, supra. Perhaps that advice might have served to cure the matter if it concerned only the subsequently stricken testimony of the criminal investigators. In view of the accused's cross-examination, however, and the ruling that the trial counsel's actions were proper, the meaning of his instruction to disregard pales into insignificance.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN concurs in the result.