UNITED STATES, Appellee,

v.

Brian J. FITZPATRICK, Senior Airman,
U.S. Air Force, Appellant.

No. 41,293.

ACM 22827.

U. S. Court of Military Appeals.

Jan. 17, 1983.

For Appellant: *Colonel George R. Stevens* (argued).

For Appellee: *Major George D. Cato* (argued); *Colonel James P. Porter* (on brief).

## Opinion of the Court

EVERETT, Chief Judge:

In a contested trial at Torrejon Air Base, Spain, a general court-martial with members convicted appellant of sale, use, and transfer of hashish and of conspiracy to sell hashish, in violation of Articles 134 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 881, respectively. Appellant was sentenced to a bad-conduct discharge, confinement at hard labor for 1 year, total forfeitures, and reduction to the lowest enlisted grade. The convening authority reduced the amount of monthly forfeitures to $299.00, but in all other respects he approved the trial results. The Court of Military Review affirmed.

In separate assignments of error, appellant's questions in this Court whether the court-martial which tried him had *in personam* jurisdiction to do so and whether during cross-examination trial counsel wrongfully elicited testimony from appellant that he had declined to make a pretrial statement. In each instance we reject appellant's claim.

### I

### A

At trial, defense counsel moved for dismissal of all charges against appellant on the ground that the court-martial lacked *in personam* jurisdiction over his client. The evidence presented on the motion reflects

that on March 15, 1979, appellant was apprehended by agents of the Office of Special Investigations (OSI) as part of a massive roundup of drug traffickers. He was handcuffed; advised of his rights; informed generally that he was suspected of having used, possessed, and sold hashish; transported to the OSI office; and photographed. In about two hours he was released unconditionally.

On the same date, appellant was placed on "administrative hold." The document announcing this "hold" of appellant and two other airmen contained the subject line: "Administrative Hold—Non-Foreign Criminal Jurisdiction Cases." However, it stated, in pertinent part, "Addressees are advised that this action should not be interpreted as alleged misconduct on the part of the above individuals since there are many reasons for requiring a hold status, e.g., essential witness in pending action against another." [1] Further, notwithstanding certain language in the "hold" document, appellant was permitted to go on leave to the United States and on temporary duty (TDY) during the ensuing period.

Appellant's date of separation (DOS) from active duty was August 3, 1979. Until that time, no further formal action was taken relative to the instant charges. In a stipulation of expected testimony considered at trial on appellant's motion to dismiss, his squadron commander indicated:

> Between March 1979 and August 1979, Fitzpatrick would occasionally contact me regarding the status of the charges against him. I in turn would contact the base legal office in order to respond to Fitzpatrick's inquiries. The base legal office would inform me that his case was being processed, but it was undecided as to whether a special court-martial or a general court-martial was appropriate in Fitzpatrick's case. I would then personally relay this information to Fitzpatrick, but there was some doubt, at least on my part, whether he would go to court or not

---

1. Indeed, it turned out that several people similarly placed on "hold" because of the same roundup did not face judicial action.

because no one said he positively would go to court. Up until I read him the specifications I had no knowledge of what he had supposedly done or that he would definitely would go to court.

On August 5, 1979, Fitzpatrick orally objected to further retention in the Air Force to his NCO supervisor, TSgt Yates, and then, on August 6, to his officer supervisor, 1Lt Agis. Finally, on August 7, appellant sent to his squadron Commander, Lieutenant Colonel Kikta, this "Demand for Discharge":

1. I hereby demand that I be discharged from the United States Air Force. My DOS was 3 August 1979; this date has passed and I object to my continued retention and I demand that I be released from further active duty. I do not consent to being kept in this status of active duty.

2. I have previously notified TSgt Yates (5 Aug 79) and 1 Lt Agis (6 Aug 79) of this problem, but to no avail. My DOS has passed and I wish no further contact or affeliation [sic] with the Air Force.

3. I would like to have my discharge or release effective immediately as I feel I am in a precarious situation. I do not feel I should have to explicitly reject military authority to prove my point. Since my status seems to be uncertain, please take steps to discharge or release me immediately.

According to his stipulation of expected testimony, the squadron commander indicated that he advised appellant "that I was outside the loop of responsibility regarding his discharge. I advised him to talk to the legal officer and CBPO." Moreover, Lieutenant Colonel Kikta subsequently "inquired of the base legal office" as to "the status of ... [appellant's] case" and was informed "that specifications were coming shortly and that Fitzpatrick would be held after his DOS." The commander relayed this information to appellant's Squadron Section Commander.

For the Government, Captain Luis Rivera testified that in late June or early July 1979 he became Chief of Military Justice at Tor-

rejon Air Base to replace another officer who was departing. At that time "a lot of courts-martial" were "pending," most of which resulted from the exposure of a large drug operation at Torrejon. Also, at the time there was a temporary shortage of lawyers in the legal office at Torrejon because of recent reassignments. Rivera indicated that there never had been any question whether Fitzpatrick would be prosecuted and the only decision to be made was whether he would be tried by general court-martial, which would require an Article 32 investigation, or only by a special court-martial. Apparently, one reason for the delay in making that decision was that appellant's case "was at the tail end" of the large number that were being processed. Also, since a new staff judge advocate was arriving at the base early July, a final decision on some of the cases was delayed until he could arrive and be briefed. Shortly, after the new staff judge advocate arrived, Captain Rivera left on TDY; when he returned during the second or third week of July, he found on his desk a note from the staff judge advocate directing that as to appellant's case he "should start proceeding with a view towards a general court-martial." Thereupon, Rivera "looked at the paperwork again, put the offenses in the proper form, drafted the specifications, and gave them to" a legal clerk in the office to have them typed.

It is unclear from the record what happened to appellant's case during the next month. In any event, Captain Rivera testified that on the 13th or 14th of August he finally reviewed the specifications and they appeared to be in proper form. The clerk proceeded to gather some other materials or information that she needed to further process the case. On August 15, Captain Rivera was called by someone from the personnel office inquiring whether charges had yet been preferred against appellant. He was told that one of the concerns was that appellant already had passed his date of separation. Captain Rivera testified at trial that this was the first he knew that appellant's DOS had passed. He immedi-

ately asked appellant's commander to come to his office, where the commander reviewed and swore to the charges against Fitzpatrick. Appellant then was located and, on August 15, he was read the charges against him.

In denying appellant's motion to dismiss for lack of *in personam* jurisdiction, the military judge reasoned:

> Well, gentlemen, I have read the cases that you cited, and I must say I view this case as a somewhat close case, especially in view of the rather nebulous warning given. Nonetheless, considering the *United States v. Hudson,* and I've mentioned Headnotes 7 and 8 therein, as well as paragraph 11d of the Manual. As I read the law at this point in time, I must deny the defense motion and find, in fact, that this court has jurisdiction, and I do find that the accused's military status did not terminate on the 3rd of August because the Government had commenced action with a view to trial, specifically, apprehending him in the timeframe of 14–15 March, and advising him of the rights pursuant to Article 31, to include the general nature of the offense of which he was suspected. Therefore, I find that this court does have jurisdiction over the accused and of the charges and specifications before us. I submit, however, that that somewhat tenuous warning or vague warning given by the agent, in not naming the specific times and places does make it a much more interesting and close case than it might ordinarily have been. I think a clear warning would have precluded this confusion, as the defense's own argument brings forth. However, I think the law is. sufficiently clear at this point in time.

## B

As we have frequently observed, an active duty serviceperson is subject to the Uniform Code of Military Justice while retained on active duty. Article 2(1), U.C. M.J., 10 U.S.C. § 802(1); *see United States v. Self,* 13 M.J. 132, 136 n. 7 (C.M.A.1982). Such a serviceperson's relationship with the military is not simply contractual; instead, the member's enlistment creates a *status* which continues until lawfully terminated. *See In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *United States v. Handy,* 14 M.J. 202 (C.M.A.1982); *United States v. Hutchins,* 4 M.J. 190, 191 (C.M.A. 1978), and cases cited therein. Accordingly, the passing of a date of separation entitles the servicemember to be separated, but it does not, alone, operate to accomplish that separation.[2] *See United States v. Handy, supra; United States v. Klunk,* 3 U.S.C. M.A. 92, 11 C.M.R. 92 (1953).

Accordingly, under our precedents, the Government loses jurisdiction to try a servicemember unless either (a) prior to his date of separation, some official action has been taken by which we "can say that at some precise moment the sovereign had authoritatively signaled its intent to impose its legal processes upon the individual," *United States v. Smith,* 4 M.J. 265, 267 (C.M.A.1978); or (b) after the member's date of separation, he does not object "to his continued retention";[3] or (c) if the servicemember "objects to his continued retention" on active duty after his date of separation and demands his discharge or release, the Government takes official action with the view to prosecution within "a reasonable time" after the servicemember's protest of his retention in the service, *United States v. Hutchins, supra* at 192.

The ruling of the military judge in this case was based on the first of these alterna-

---

**2.** In the author judge's view, court-martial jurisdiction over a servicemember continues until his military status is terminated by separation, even when there has been unwarranted delay in separating him and he has actively requested to be separated. *See United States v. Douse,* 12 M.J. 473, 481 (C.M.A.1982) (Everett, C.J., concurring in the result). However, that view

has not yet captured a majority on our Court, as reflected in the other opinions in *Douse.*

**3.** In that event his military status continues and the Government has no obligation to take any affirmative steps in order to preserve that status. *United States v. Hutchins,* 4 M.J. 190, 192 (C.M.A.1978).

tives, which was supported by the evidence that long before his date of separation Fitzpatrick had been apprehended; advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831; generally informed of the offenses of which he was suspected; taken in handirons to the OSI office for processing; photographed; and subsequently placed on administrative "hold." *See generally United States v. Self, supra; United States v. Wheeley,* 6 M.J. 220 (C.M.A.1979). However, the judge remarked that it was an "interesting and close case"—a comment presumably prompted by evidence that the advice given appellant about the offenses of which he was suspected had been rather general; he had been released from custody unconditionally; and the very language in the "hold" document tended to compromise its import as a signal of the Government's intent to prosecute.

■ We need not decide here whether the acts of the Government in apprehending appellant and in placing him on administrative "hold" "authoritatively presage[d] a court-martial, when viewed in the light of surrounding circumstances." *See United States v. Self, supra* at 138. Instead, we conclude that when Fitzpatrick objected to his continued retention in the Air Force after his date of separation arrived, the Government proceeded within a reasonable time to prefer charges against appellant and to read them to him—actions which unerringly evinced an intent to prosecute. Accordingly, we hold that appellant's court-martial possessed *in personam* jurisdiction over him.

## II

Commencing his cross-examination of appellant, trial counsel asked whether "prior to" that occasion he ever had interviewed Fitzpatrick "about the matters you've testified," to which appellant responded in the negative. Trial counsel pursued the point with a second question, "This is the first time I've heard this story, isn't that right?" Appellant answered, "Uh, yes, I believe it is." Later in his interrogation of appellant, trial counsel established that an Article 32 investigation had taken place several months earlier. According to appellant, this evidence adduced by trial counsel's cross-examination of him was prejudicial when considered in conjunction with testimony earlier in the trial by an investigator, who described an Article 32 investigation in this way:

I believe the evidence is presented to an investigating officer *by the various sides, the defense and the prosecution,* and it's decided whether there is sufficient evidence for the incident to go to trial.

(Emphasis added.)

Appellant complains that, for all practical purposes, "the members were informed that on at least one occasion appellant had declined to testify." According to his argument, the members probably reasoned: (1) There had been an Article 32 investigation in this case; (2) at that time the defense had an opportunity to present evidence; (3) trial counsel had not heard Fitzpatrick give his version of the relevant events; (4) trial counsel would have heard this version before if appellant had testified during the Article 32 investigation; (5) therefore, appellant must not have testified during the investigation; and (6) he would have testified at that time if he were innocent as he now asserts.

■ Appellant correctly observes that it has long been the position of this Court that it is improper to bring to the attention of the members that the accused has exercised his right to remain silent prior to trial. *See, e.g., United States v. Stegar,* 16 U.S.C. M.A. 569, 37 C.M.R. 189 (1967); *United States v. Tackett,* 16 U.S.C.M.A. 226, 36 C.M.R. 382 (1966); *United States v. Brooks,* 12 U.S.C.M.A. 423, 31 C.M.R. 9 (1961). Indeed, our rulings in these cases generally mirror constitutional decisions of the United States Supreme Court. *See, e.g., Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *See also United States v. Hale,* 422 U.S. 171 (1975); *Stewart v. United States,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). *Cf. Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); *Jenkins v. Anderson,* 447 U.S.

231, 100 S.Ct. 2124, 65 L.Ed. 86 (1980). Of course, these decisions are intended to prevent a trier of fact from using the sort of syllogism which appellant argues may have been employed by the court members in his case. In short, we seek to eliminate any opportunity for the trier of fact to infer that an accused who has exercised constitutional or statutory rights to remain silent during an earlier proceeding must be prevaricating when at trial he takes the stand and proclaims his innocence. *Cf. United States v. Moore,* 1 M.J. 390 (C.M.A.1976).

In the present case several flaws appear in appellant's argument. In the first place, it is not clear that the court members would have assumed that the trial counsel had been present during the Article 32 investigation. Interestingly, it appears that during the Article 32 investigation appellant did testify on the issue of jurisdiction and that at that time the trial counsel was not present.

■ Moreover, upon reading in its entirety the relevant segment of trial counsel's cross-examination of appellant (which has been attached to this opinion as an appendix) we are persuaded that the isolated exchanges on which appellant relies do not accurately reflect the nature of the questioning. In part, trial counsel's opening questions seemed to be directed to setting the scene for extensive questioning; he was impliedly suggesting that he would have to ask appellant a number of questions because of his unfamiliarity with appellant's version of events. Secondly, it appears to us that trial counsel's initial questions were a preface to an effort by the prosecutor to demonstrate that not only did Fitzpatrick have a motive to fabricate his testimony at trial, but also he had enjoyed ample opportunity to preview the Government's evidence and to decide how best to fashion his own account. Indeed, when individual defense counsel objected to trial counsel's cross-examination, the judge in-

terpreted the trial counsel's inquiries as being designed to establish "that there are many factors that apply here, some of which might provide a motive to be other than truthful." Undoubtedly, no one in the courtroom who was listening to the cross-examination—rather than simply being exposed to one or two questions and answers out of context—could reasonably perceive the sinister implication which appellant now finds in the questioning. Indeed, if such implications had been apparent, we have no doubt that Fitzpatrick's defense counsel, who vigorously and competently asserted his rights at the trial, would have lodged a suitably specific objection.[4]

■ Finally, notwithstanding these observations, even if someone could reasonably have inferred from the questioning that appellant had invoked his right to silence on some prior occasion, our reading of appellant's testimony in its entirety convinces us beyond a reasonable doubt that under the circumstances of this case appellant was not prejudiced. *Cf. Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Ward,* 1 M.J. 176 (C.M.A.1975).

### III

Accordingly, the decision of the United States Air Force Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

### APPENDIX

### CROSS–EXAMINATION

Questions by prosecution (TC):

Q. Airman Fitzpatrick, prior to today I've never had an occasion to interview you about the matters you've testified?

A. No, sir; I don't believe you have.

Q. This is the first time I've heard this story, isn't that right?

A. Uh, yes, I believe it is.

---

4. Unlike the numerous situations in which the failure of trial defense counsel to lodge an objection waives the rights of the accused, we, of course, do not rely on waiver to affirm a case if, without objection, the prosecutor comments directly or indirectly on an accused's failure to take the stand at trial or at an earlier point in the proceedings.

Q. Now, you've been in the military service four years or more, is that right?

A. Yes, sir.

Q. And you went through basic, did you not?

A. Yes, sir.

Q. And you, you've been at various military installations, have you not?

A. Well, one other PCS besides. Luke Air Force Base; yes, sir.

Q. And while in the service have you had occasion to attend military justice briefings?

A. To be frank with you, sir, I don't believe I've ever attended a UCMJ, it's the UCMJ update, is that what you are referring?

Q. That's right.

A. I don't believe that I have ever attended.

Q. Let me ask you this: as a result of your service connection the last four years, do you understand what a general court-martial is, basically?

A. Yes, sir.

Q. Okay, you understand it's the most serious type of court-martial the military has to offer, is that right?

A. Yes, I do.

Q. And you understand the charges and specifications in front of you today, do you not?

A. Yes.

Q. What you are charged?

A. Yes, I do.

Q. And you've talked with your attorneys about them?

A. Yes, I have.

Q. And as a result of those conversations and your prior experience as a military member, and reading the charges and specifications, you realize that if this court finds you guilty, there are a number of things that could happen to you, isn't that right?

A. Yes, I'm aware of that.

Q. For example, you could be discharged from the military service with a dishonorable discharge, are you aware of that?

A. Yes, sir.

Q. That you could be confined at hard labor for some period of years?

A. Yes, sir.

Q. That you could be ordered to forfeit all your pay and allowances?

A. Yes, I'm aware of that also.

Q. That you could be reduced in rank to the lowest enlisted grade?

A. Yes, sir.

Q. Have you had to work for that rank pretty hard, by the way?

A. Yes, sir; I've worked pretty hard since I've been in the Air Force.

Q. And any number of other punishments, too, lesser than the ones I've just mentioned, isn't that right?

A. Yes, sir.

Q. And you understand that a discharge might prejudice your opportunities to find a civilian job, for example, a bad discharge from the military?

A. Yes, that's very possible.

Q. And did you come in for the GI bill?

A. Yes, sir; I did.

Q. And you understand you might lose your benefits as a result of the general court-martial?

A. Yes, sir.

Q. So I think it's fair to say, and you would agree with me, would you not, if I put the proposition to you that if convicted by this court, you have a lot to lose, have you not?

IDC: Your honor, I'm going to object. It's not only immaterial but what he's getting at is, simply because he pled not guilty, which he has a right to do, that he is prevaricating.

MJ: No, sir; I don't believe that's the thought. I believe the thought that the trial counsel is trying to establish is the idea that there are many factors that apply here, some of which might provide a motive to be other than truthful.

IDC: Well, that's—

MJ: He's simply trying to establish those possibilities on the record.

IDC: All right, thank you.

MJ: Your objection is overruled.

Questions by prosecution (TC), continued:

Q. So the answer to my question is that you realize you have a lot to lose if convicted by the court-martial, isn't that correct?

A. Yes, sir.

Q. And you were charged formally in about August of 1979, were you not?

A. Yes, August 15th.

Q. And there was an Article 32 investigation in your case in about September of that same year, 1979?

A. Yes, sir.

Q. And an Article 32 investigation is, basically, a preliminary proceeding where the Government comes in and puts forward all the evidence, isn't that right?

A. Yes, sir.

Q. And at that proceeding you heard Miss Lekawa testify and Rodney Moore testify, and the other witnesses testified, and the Government basically put on its whole case to you at that particular time, didn't they?

A. Yes, sir.

Q. So, since the middle of September 1979, you've had an exact idea of what the Government was going to do in this case here in the last three or four days that it has gone?

A. Well, to some degree, as much as I understand the judicial system.

Q. And that was about five months ago, was it not?

A. Yes, approximately.