# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, ALDYKIEWICZ, and MARTIN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist ELLIOT M. CARRASQUILLO**
**United States Army, Appellant**

ARMY 20110719

Headquarters, 25th Infantry Division and United States Division – Center, Iraq
Michael J. Hargis and Frank D. Whitney, Military Judge
Colonel George R. Smawley, Staff Judge Advocate

For Appellant: Captain Ian M. Guy, JA; Timothy C. Parlatore, Esquire (on brief and reply brief); Major Vincent T. Shuler, JA; Captain Ian M. Guy, JA; Timothy C. Parlatore, Esquire (on supplemental brief).

For Appellee:  Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA (on brief); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA (on supplemental brief).

27 November 2013

------------------------------------
OPINION OF THE COURT
------------------------------------

MARTIN, Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of conspiracy to commit robbery with a firearm, one specification of conspiracy to commit burglary, one specification of robbery with a firearm, and one specification of burglary, in violation of Articles 81, 122, and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 922, 929 (2006) [hereinafter UCMJ].  The panel sentenced appellant to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, reduction to the grade of E-1, a fine of $1,500, and an additional month of confinement if the fine was not paid.  The convening authority disapproved the contingent confinement and the adjudged forfeitures, and otherwise approved the sentence as adjudged.

CARRASQUILLO—ARMY 20110719

Appellant's case is before this court for review pursuant to Article 66, UCMJ. Appellant raises two assignments of error, neither of which merits discussion or relief.[1] During our review, however, we noted there were several instances where appellant's invocation of his right to remain silent was discussed in the record of trial.[2] After directing the parties to brief the specified issue, we reviewed the submissions and determined that while this issue warrants discussion, the facts and circumstances of this case do not require relief.

## I. BACKGROUND

### A. Background of the Charged Criminal Conduct

Appellant, a National Guard soldier deployed with his military police company, was assigned to Al Asad Airbase in Iraq. During the course of his duties as a military policeman, he was part of an inspection team that discovered that an Iraqi businessman, Mr. DIIA, was holding thousands of dollars in currency in a safe at his containerized housing unit (CHU) on Al Asad Airbase. Mr. DIIA and his brother owned and operated a company that conducted many of the maintenance functions on the airbase. As such, he maintained a large sum of money to purchase supplies and pay employees. Mr. DIIA lived in the CHU and conducted his business out of the CHU.

Appellant and most of his unit were scheduled to redeploy late in the evening on 1 April 2011. A few weeks before their departure, appellant and one of his co-

---

[1] We have also considered those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and we find they warrant no discussion or relief.

[2] We note the record of trial also contains several references to appellant's Sixth Amendment right to counsel. While they are separate and distinct rights, they are "closely related." *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001). Both the right to silence and to counsel are often discussed at the same time during trial, and in many cases, the rights are intertwined. *See, e.g., Unites States v. Moore*, 1 M.J. 390, 391 (C.M.A. 1976) (stating that it is well settled that it is improper to elicit evidence regarding appellant's assertion of his rights to counsel or to remain silent before the triers of fact). Based on the facts of this case, we chose to focus our opinion on the impact of the discussion of appellant's invocation of his right to remain silent. However, we reach the same conclusion regarding appellant's right to counsel.

conspirators, Specialist (SPC) TJ, approached SPC JE[3] and asked him if he wanted to participate in their scheme to steal money from Mr. DIIA. Specialist JE thought they were joking and declined to participate. On 31 March 2011, appellant and SPC TJ approached Private First Class (PFC) JB with the same plan. Private First Class JB indicated he was interested. Appellant, SPC TJ, and PFC JB then conspired to burglarize and rob Mr. DIIA of the currency stored at his CHU. In the early morning hours of 1 April 2011, the group unlawfully entered Mr. DIIA's living quarters and robbed him at gunpoint. They stole over $380,000 in U.S. currency and hid the money in an abandoned container while they decided the best way to smuggle the cash out of the country. When SPC JE found out that Mr. DIIA had been robbed and heard a description of the assailants, he confronted appellant and SPC TJ, who admitted that they participated in the crimes. Specialist JE informed his command of these disclosures, and appellant and the two other soldiers were quickly identified as potential suspects in the crimes. Appellant and SPC TJ were removed from the redeployment flight.

On 2 April 2011, Special Agent (SA) CH from the Army Criminal Investigation Command (CID) read appellant his rights, telling him he was a suspect in the incident. Appellant invoked his right to remain silent and requested to speak with an attorney. There is no record of appellant providing a statement to CID or speaking about the incident prior to his testimony at trial.

### B. Appellant's Trial

At trial, the government presented a strong case with substantial corroborating evidence. Private First Class JB testified under a grant of testimonial immunity. He described in detail the conspiracy, the burglary, and the robbery of Mr. DIIA. Mr. DIIA testified similarly to PFC JB regarding the burglary and the robbery and identified appellant with 80-90% certainty. Specialist JE testified that appellant and SPC TJ approached him in March 2011 and asked him to be a part of their criminal plan. He stated that he believed they were joking and declined. He also testified that following the incident, he approached appellant and SPC TJ, and both soldiers individually revealed that they had, in fact, executed their scheme and provided even more information regarding the details of the burglary and the robbery. Specialist TJ did not testify.

In response, the defense presented a consistent three-pronged theory throughout all phases of the trial. First, the defense challenged the credibility of the

---

[3] JE was a Private First Class at the time of the incident. He was subsequently promoted to Specialist by the time of trial. We will refer to him throughout this opinion as SPC JE.

government witnesses. Included in this argument was that Mr. DIIA was mistaken as to the identity of the perpetrator. Second, the defense argued CID felt pressured to complete the case quickly given that the entire unit was scheduled to redeploy, and CID did not thoroughly investigate the case and review alternative theories. Third, the defense argued appellant had an alibi and could not have committed the crimes. Three different witnesses from appellant's unit testified they either spoke with or saw appellant at the time the crimes were committed near his CHU cleaning, packing, and preparing for the redeployment inspection.

On three separate occasions during appellant's trial, the panel heard evidence regarding appellant's invocation of his rights during the interview with CID.

## 1. Testimony by SA JT

The defense called SA JT to the stand as a witness during their case-in-chief. Special Agent JT was the agent in charge at Al Asad Airbase and had supervisory responsibility for appellant's investigation. The defense counsel elicited SA JT felt pressure to complete the investigation because it was high visibility and could potentially delay the redeployment of the entire unit. He then asked about the status of appellant at the time Mr. DIIA identified him in the photographic lineup:

> Q: Okay. And at that time, 5 April, what was the status of Specialist Carrasquillo? And what I mean by "status" let me give you a multiple choice. Was he a suspect? Was he not a suspect? Had he been taken into custody? Had he been booked? What had happened to him by 5 April?
>
> A: Yes, sir. I understand what you're asking.
>
> Q: Okay.
>
> A: By 5 April, we had already *attempted to conduct an interview of Specialist Carrasquillo, which he did not provide a statement*. We [sic] had been released back to his unit, which was temporarily going to be assigned to 3-7 Infantry Battalion, and then he was ultimately assigned to the Base Command Group, Al Asad. At that time, he was considered a subject to the investigation and a photo lineup was prepared on that date.

(emphasis added). Defense did not request an Article 39(a), UCMJ, session or request a limiting instruction at any time regarding this testimony.

4

2. Cross-Examination of Appellant

Later in the defense case, appellant provided sworn testimony. He testified in a narrative format and he presented an alibi defense. During cross-examination of appellant, the trial counsel established appellant was present for the entire court-martial, heard all the witnesses, and had the ability to alter his testimony to match that of the various witnesses. The trial counsel then attempted to highlight that appellant had never told this exculpatory version of events to anyone else.

> Q: Now, this is a pretty well prepared statement and you sound completely innocent. Why didn't you just tell somebody this before hand?
>
> A: CID questioned me in the beginning, when I told them what actually happened, they told me while [sic] I'm questioning you for robbery and I said I need to speak to a lawyer.
>
> Q: So you didn't give a statement. [sic]
>
> A: They told me directly that you are being accused of robbery. They were asking - - the way they were questioning me was like I was guilty, right there. And I said I need to speak to a lawyer and that is what I did.

Later in the cross-examination, the government counsel persisted in exploring appellant's decision to remain silent when questioned by CID.

> Q: Did you tell anyone that you wanted to tell your side of the story?
>
> A: Yes.
>
> Q: Who did you tell?
>
> A: I told everybody.
>
> Q: Did you tell CID?
>
> A: Yes, I did? [sic]
>
> Q: Then why do you not have a statement?

A: Because like I said, the way they were questioning me was like I was automatically guilty. I didn't feel comfortable and I just asked for legal representation.

Q: So, you're telling us that CID neglected to put that as part of their investigation?

A: That's not what I am saying. What I am saying is, the way they were questioning me I was uncomfortable and I just asked for legal representation. If you ask a person did you do this, a simple yes or no answer. The way they were questioning me was, we know you did this. I didn't feel comfortable being accused automatically and that is why I asked for legal representation.

### 3. Rebuttal Testimony by SA CH

After the defense rested, on rebuttal, the government recalled SA CH. The trial counsel asked SA CH to describe the interview and how it was initiated. He then asked a series of questions regarding appellant's invocation of his right to remain silent.

Q: And then you arrived at the interview room and you read him his rights, what happen [sic]?

A: During rights advisal, Specialist Carrasquillo refused to touch the rights advisal, he refused to initial any of the spots or sign the form. We actually had to get our Special Agent [J]T, our special agent in charge, to come in and explain to him the form and ask him to at least check the box that said he wanted a lawyer.

The trial counsel asked even more questions of SA CH regarding the procedure he used to administer the rights advisal, later asking the agent:

Q: So, did Carrasquillo waive his rights?

A: No, he did not.

Q: And did he tell you that he wanted to tell his story?

A: No, he did not. He stated he wanted a lawyer.

Appellant was represented at trial by both civilian and military defense counsel. No one from the defense team objected to any of these questions or

6

responses by the witnesses. Instead, during cross-examination of SA CH, the defense counsel continued the line of questions regarding the interview with appellant, attempting to determine if SA CH used any techniques such as lying to appellant or playing "good cop, bad cop" in order to elicit a statement. While admitting that such techniques were authorized by CID, SA CH denied he ever used any such methods to attempt to induce a confession from appellant. Special Agent CH stood by his testimony that he did not intentionally create a pressure-filled interview environment, but merely conducted the interview consistent with standard procedures. The defense never requested, and the military judge never provided, any curative instructions. Finally, neither the trial counsel nor the defense counsel mentioned appellant's invocation of his rights closing arguments.

## II. LAW

### A. Right to Remain Silent and Right to Counsel

After its landmark decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court continued to explore the extent of a defendant's due process right to remain silent when questioned by law enforcement in a series of cases. *See, e.g.*, *United States v. Hale*, 422 U.S. 171 (1975). In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Court concluded that the use of a defendant's post-arrest silence to impeach defendant's exculpatory testimony by cross-examining the defendant about remaining silent violates the defendant's due process rights under the Fourteenth Amendment. Specifically, the Court found that

> while it is true that *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id*. at 618.

### B. Limitations on the Right to Remain Silent

While *Doyle* made clear the fundamental nature of the right to remain silent, the extent of this protection is not without limits. Indeed, the Court in *Doyle* recognized the long-standing principle that the government must have the ability to vigorously cross-examine a defendant who chooses to take the stand in his own defense in order to ensure that defendants do not frustrate the truth-seeking function of a trial. *Id*. at 617 n.7 (citing *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)); *see Portuondo v. Agard*, 529 U.S. 61, 73 (2000) (holding that "[a]llowing

comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate–and indeed, given the inability to sequester the defendant, sometimes essential–to the central function of the trial, which is to discover the truth.").  Moreover,

> it goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest.  In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Doyle* at 620 n.11 (citing *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975)); *see Anderson v. Charles*, 447 U.S. 404, 408 (1980) (holding that the rationale provided in *Doyle* does not apply when the cross-examination of a defendant is limited to exploring prior inconsistent statements).

In addition to allowing the government latitude to cross-examine and otherwise contradict defendants with their post-arrest silence when warranted, the Supreme Court has also held the prosecution may fairly comment on a defendant's post arrest silence during closing argument in certain circumstances.  In *United States v. Robinson*, 485 U.S. 25 (1988), the Court addressed the prohibition against prosecutorial comment upon the failure to testify, which is a corollary of the right to remain silent.  During closing argument, the defense counsel in *Robinson* argued the government did not allow his client to explain his side of the story.  *Id*. at 28.  The prosecutor argued that the defense had "opened the door" to a full explanation and the trial judge allowed the government to explain that the defendant had the opportunity to take the stand but he chose not to do so.  *Id*.  The trial judge also included in the jury instructions an admonition that "no inference whatever may be drawn from the election of a defendant not to testify."  *Id*. at 28-29.  The Supreme Court held that the prosecutor's statement did not violate the defendant's Fifth Amendment rights, and was, instead, a "fair response" to an argument made by defendant.  *Id*. at 34.  Similarly, other federal courts have found that a defendant's right to silence "is not excluded so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." *Fairchild*, 505 F.2d. at 1383.

## C.  The Evolution of the Law in Military Jurisprudence

Our superior court has held the due process right to remain silent applies to service members based upon Article 31, UCMJ.  "It has long been settled that an accused's pretrial reliance upon his rights under . . . Article 31, when interrogated

concerning an offense of which he is suspected, may not be paraded before a court-martial . . .” *United States v. Brooks*, 12 U.S.C.M.A. 423, 425-26, 31 C.M.R. 9, 11-12 (C.M.A. 1961). Military Rule of Evidence [hereinafter Mil. R. Evid.] 301 (f)(3) provides “[t]he fact that the accused during official questioning and in exercise of rights under the Fifth Amendment to the Constitution of the United States or Article 31, remained silent, refused to answer a certain question, requested counsel, or requested that the questioning be terminated is inadmissible against the accused.” Mil. R. Evid. 304(h)(3) also safeguards an appellant’s exercise of his Fifth Amendment rights: “A person’s failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation or was in confinement, arrest, or custody does not support an inference of an admission of the truth of the accusation.” Therefore, “[s]ervicemembers have a constitutional, statutory, and regulatory right to silence,” and it is “settled that the government may not use a defendant’s exercise of his Fifth Amendment rights as substantive evidence against him.” *United States v. Clark*, 69 M.J. 438, 443 (C.A.A.F. 2011).

In *Clark*, the appellant was charged with one specification of attempting to communicate indecent language to a child under the age of sixteen and one specification of using the internet to transfer sexually explicit electronic messages to a person he believed had not attained the age of sixteen. *Id*. at 440. The trial counsel’s opening statement referred to appellant’s reaction and demeanor to convey “that Appellant failed to deny the accusation” when he was confronted by a special agent from Office of Special Investigations (OSI) of his suspected crimes. *Id*. at 446. During the direct examination of the same special agent who questioned appellant, the trial counsel again elicited testimony regarding appellant’s reaction when told of the accusations against him. During his closing argument, trial counsel relied on appellant’s failure to deny the accusations and his body language to argue that appellant’s silence evidenced his guilt. *Id*. Ultimately, the court found it was plain and obvious error for trial counsel to elicit testimony of appellant’s failure to respond verbally to an accusation when apprehended and then rely on this testimony in closing argument. *Id*. at 445; *cf. Salinas v. Texas*, 133 S. Ct. 2174 (2013) (holding that during a non-custodial interview, silence alone is insufficient to invoke Fifth Amendment protections, instead, a defendant must affirmatively invoke his or her right to remain silent). However, the court noted the appellant was positively identified by his name and contact information online; law enforcement recovered a notebook near appellant’s computer that contained the same user name he used online; upon arrest, appellant made a spontaneous admission that he knew the person he was communicating with was underage; and finally, appellant waived his rights and made a full statement to OSI admitting to sexual communications with someone he believed to be thirteen years old. Based on this evidence, the court concluded that the violations were harmless beyond a reasonable doubt. *Clark*, 69 M.J. at 448.

In *United States v. Riley*, the court held that the "admission of the investigator's testimony concerning appellant's invocation of his right to remain silent, constituted plain error . . . ." 47 M.J. 276, 277 (C.A.A.F. 1997). The court also concluded that the error materially prejudiced the substantial rights of appellant. *Id.* In that case, a special agent from the Naval Criminal Investigative Service repeatedly testified that appellant invoked his right to remain silent. *Id.* at 278. The court noted that the special agent was the government's first witness, had "only the most marginal hearsay knowledge of the case . . ." and "was the filter through which all the other evidence was viewed by the members." *Id.* at 280. The court reasoned that this "tainted view" was especially important given there was no physical evidence and the "testimony of the prosecutrix was wavering." *Id.*

Alternatively, the strategy pursued by the defense at trial may be sufficient to open the door to a discussion of appellant's invocation of his rights. In *United States v. Gilley*, part of appellant's trial strategy was based on attacking the veracity of the investigating agents. 56 M.J. 113, 121 (C.A.A.F. 2001). During opening statement, the defense announced their intent to show that investigators fabricated a statement by appellant, and in furtherance of their theory, rigorously cross-examined the agents on appellant's refusal to sign the document. *Id.* at 116. The court found that "the defense counsel opened the door to rebuttal . . . thus inviting a response from those same agents suggesting an alternative theory as to why appellant refused to sign the statement." *Id.* at 122. While not ruling on whether or not the military judge erred by allowing the testimony, the court did determine that given the context of the case, there was no material prejudice to appellant's substantial rights. *Id.; see* UCMJ art. 59(a).

Our predecessor court reached a similar conclusion in *United States v. Velez*, where the defense used the invocation of rights "as a calculated strategy." 22 M.J. 637 (A.C.M.R. 1986). The court found error when the trial counsel elicited information from the CID agent that appellant exercised his right to remain silent. *Id.* at 639. Later in the case, the appellant testified in his own defense, proclaimed his innocence, and asserted that he attempted to cooperate with CID by initiating a statement, and only terminated the interview because he believed CID was "placing something untrue in the statement." *Id.* The court found the combination of "appellant's lack of objection, his failure to ask for a cautionary instruction, and his subsequent affirmative use of his invocation of rights as part of his case," along with the overwhelming evidence of his guilt, made any error harmless beyond a reasonable doubt. *Id.* at 640.

In *United States v. Ross*, our superior court held that even in the absence of an objection by the defense, the military judge had a sua sponte obligation to take action to prevent the admission of evidence pertaining to an appellant's invocation of the right to remain silent, "or at least ascertain any legitimate reason for its admission and give an appropriate limiting instruction to the court members."

7 M.J. 174, 176 (C.M.A. 1979) (citing *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975)). The court went on to remind us that this type of evidence requires special protection, "not because of its inflammatory nature, but because of its constitutional overtones." *Id.* Moreover, allowing this evidence to be introduced to a panel without inquiry and failing to consider the use of an appropriate instruction raises "significant questions of elementary fairness." *Id.* (citing *Doyle*, 426 U.S. at 618 n. 9). "The military judge is 'more than a mere referee' and has a duty to insure the accused receives a fair trial." *United States v. Blackmon*, 39 M.J. 1091, 1093 (A.C.M.R. 1994) (citing *Graves*, 1 M.J. at 53).

### D. Standard of Review

Normally, when the government elicits evidence regarding appellant's invocation of rights before the finder of fact, the test for prejudice is the constitutional standard of harmless beyond a reasonable doubt. *Riley*, 47 M.J. at 278. However, in cases where there was no objection, we review for plain error. *Gilley*, 56 M.J. at 123. "[A]ppellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (citing *United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998)). "Once [appellant] meets his burden of establishing plain error, the burden shifts to the Government to convince us that this constitutional error was harmless beyond a reasonable doubt." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citing *United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999)).

### III. DISCUSSION

There were three occasions when the panel heard evidence regarding appellant's invocation of constitutional rights. We will review each incident independently. We will also determine if cumulatively, the discussion of appellant's invocation of the right to remain silent materially prejudiced the substantial rights of the appellant. In doing both, we keep in mind appellant's three-pronged defense theory at trial: attacking the reliability of the government's evidence; criticizing the CID investigation; and establishing appellant's alibi defense.

### A. Testimony by SA JT

The first instance when a witness commented on appellant's invocation of the right to remain silent occurred during the defense's case-in-chief. The government asserts appellant affirmatively elicited this evidence. We disagree. The defense counsel asked SA JT a clear question designed to evoke a specific response, that is, what was the status of appellant at the time of the photo identification. This line of questioning was clearly linked to the first and second part of the defense strategy – Mr. DIIA was mistaken when he identified appellant as the assailant and investigators hastily concluded their case, wrongfully accusing appellant. Instead of

responding with one of the "multiple choice" answers suggested by defense counsel, SA JT improperly commented on appellant's right to remain silent. The government further argues that like the appellant in *Velez*, appellant in this case never objected to evidence of his invocation or requested a limiting instruction, which demonstrates appellant's use of his invocation as part of his overall strategy. We believe the facts of this case are distinguishable not only from *Velez*, but also from the scenario presented in *Gilley*. Unlike the appellants in the aforementioned cases, the appellant's strategy in this case did not include any assertion that law enforcement either improperly summarized or fabricated his statement. While we could infer the defense counsel allowed this clearly inappropriate testimony in an attempt to demonstrate CID disregarded appellant's alibi, we could also infer that having received a nonresponsive answer from their own witness, the defense counsel simply made a calculated decision not to highlight his client's invocation in front of the panel.

Contrary to the government's assertion, we do not find the defense's failure to object to SA JT's testimony was a departure from their trial plan and did not necessarily open the door to a response suggesting an alternative theory as to why appellant refused to provide a statement. *Cf. Gilley*, 56 M.J. at 122 (finding the defense counsel's rigorous cross-examination of law enforcement as to why appellant refused to sign the sworn statement did open the door to rebuttal). In fact, nothing in the record supports the conclusion that the defense elicited testimony from this witness regarding appellant's invocation in an attempt to explain appellant's version of the events or to somehow enhance the credibility of his in-court testimony. *Cf. Velez,* 22 M.J. at 639 (analyzing the facts and the holding in *United States v. Frentz*, 21 M.J. 813 (N.M.C.M.R. 1985)).

While the defense may have had a good explanation for not emphasizing the response of their own witness, we find the military judge erred by not inquiring into the purpose of this line of questioning. This is not to say the military judge was required to further highlight the testimony by immediately stopping the proceedings; instead, he certainly could have conducted an Article 39(a), UCMJ, session during the next natural break in the case. Regardless of the methodology employed, the military judge had a sua sponte duty to inquire into the purpose and propriety of the introduction of such testimony. *See Ross*, 7 M.J. at 176.

## B. Cross-Examination of Appellant

The second time mention of appellant's invocation occurred was during the cross-examination of appellant by the government. Initially, the government counsel asked a series of permissible questions. These questions focused on appellant's presence during the entire court-martial and his ability to alter his testimony to match that of the various witnesses. *See generally*, *Agard*, 529 U.S. at 73.

However, the next question attempted to direct the panel's attention to the fact that appellant had not shared the exculpatory version of events with authorities.

> Q: Now, this is a pretty well prepared statement and you sound completely innocent. Why didn't you just tell somebody this before hand?
>
> A: CID questioned me in the beginning, when I told them what actually happened, they told me while [sic] I'm questioning you for robbery and I said I need to speak to a lawyer.

While this question by the trial counsel may not have been designed to elicit testimony regarding appellant's invocation of his right to remain silent, the wording of the question left appellant with little choice but to comment on just that. In fact, much the same as the prosecutors in *Doyle*, the trial counsel's question in this case impermissibly used appellant's silence to impeach him, and in so doing, violated appellant's right to due process.

The government argues appellant himself opened the door when he responded with information regarding his interview with CID and his invocation. They further assert defense counsel's failure to object was actually a tactical decision made so that they could use appellant's invocation in support of their attack on the CID investigation. However, the record never establishes the appellant clearly intended to employ his rights invocation as part of the defense. Indeed, the military judge had an obligation to make an inquiry, and erred when he failed to do so. *See Ross*, 7 M.J. at 176 (finding that the military judge should have inquired into the purpose of the introduction of such testimony, and instructed the members if appropriate).

Ascertaining the purpose behind defense's decision to allow this line of questioning to continue without objection is especially important in this case, because, unlike the appellant in *Gilley*, the defense never argued appellant was pressured into giving an inaccurate statement, or attacked the veracity of the CID agent, or gave any indication that appellant's refusal to give a statement was a critical component of their case. 56 M.J. at 122-23. In fact, when the appellant was asked if he was suggesting CID failed to include appellant's explanation for the events surrounding the incident in their investigation, appellant clearly stated he was not making such an assertion.

> Q: So, you're telling us that CID neglected to put that [alibi statement] as part of their investigation?

13

> A: *That's not what I am saying*. What I am saying is, the way they were questioning me I was uncomfortable and I just asked for legal representation . . . .

(emphasis added).

### C. Rebuttal Testimony by SA CH

The third instance occurred after the defense completed its case on the merits. During rebuttal, the government called SA CH to the stand to testify about the CID interview with appellant. Despite appellant's declaration that he was not alleging that CID failed to include his alibi statement in the investigation, the government persisted in eliciting details of the interview, including appellant's invocation of his rights. The government argues that, similar to *United States* v. *Gilley*, the trial counsel in this case was allowed to provide testimony in "fair response" to appellant's claims that he was somehow coerced into invoking his rights. 56 M.J. at 120. The fact that the civilian defense counsel cross-examined SA CH on the techniques he may have used when he attempted to interview appellant, rather than object to the line of questioning in its entirety, bolsters this argument. However, while we agree that at certain points in the case, the defense appeared to minimize the impact or at least explain appellant's invocation of rights, the record does not clearly demonstrate that appellant intended to use the invocation as part of his defense. This ambiguity further underscored the requirement for the military judge to inquire further about the introduction of this evidence. Appellant testified he was "uncomfortable" with the way the agents were questioning him, and requested legal representation, assertions that are clearly distinguishable from those made by appellants in the *Gilley* and *Velez* cases. It is a far different state of affairs to argue that the testimony by a law enforcement agent was false or even misleading, than it is to assert that an appellant felt pressured by the atmosphere of the interrogation and decided to invoke his rights. The law implicitly recognizes this same impact on an individual, "[b]ecause custodial police interrogation, by its very nature, isolates and pressures the individual, . . . '[e]ven without employing brutality, the 'third degree,' or [other] specific stratagems, . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 455).

If the military judge had taken the appropriate steps to determine why defense counsel failed to object to the testimony of SA CH, we would have had a fuller picture of the defense strategy. Even if the defense counsel decided not object for tactical reasons, the military judge could have considered the use of a limiting instruction to prevent members from misusing the evidence. Instead, the judge allowed this improper testimony to go forward without explanation, and erred when he failed to inquire into the circumstances.

## D. Plain Error and Harmlessness

The errors made in this case were plain and obvious. When an appellant takes the stand in his own defense, he only waives his right to remain silent during the proceedings. The appellant does not immediately relinquish his previously asserted constitutional rights. The strict adherence to the rights of appellants in this regard has been clearly established.

> This principle is founded upon the open-eyed realization that to many, even to those that know better, the invocation by a suspect of his constitutional and statutory rights to silence and to counsel equates to a conclusion of guilt that a truly innocent accused has nothing to hide behind assertion of these privileges.

*Moore*, 1 M.J. at 391 (citing *Ullmann v. United States*, 350 U.S. 422, 426 (1956)).

As such, counsel and trial judges must approach any discussion of an appellant's invocation of right to silence and right to counsel with trepidation.[4] The invocation of these constitutional and statutory rights are simply too important to reveal to a panel, directly or indirectly, without careful forethought and a full understanding of the underlying principles that govern them. Military judges must be vigilant when counsel take seemingly small, but tremendously perilous forays into this area, "and take steps to insure a constitutional or codal shield for the criminal accused is not improperly transformed into a prosecutorial tool by the Government." *Ross*, 7 M.J. at 176 (citing *United States v. Nelson*, 1 M.J. 235, 237 (C.M.A. 1975)).[5]

---

[4] In this case, the testimony was focused on whether the appellant ever made an alibi statement prior to his testimony during the court-martial. Appellant's request for counsel was part and parcel of his decision to not make a statement. Therefore, we chose to focus our review on appellant's invocation of the right to remain silent. However, admitting evidence regarding appellant's request for counsel is equally erroneous. Our analysis and our conclusion regarding prejudice remains the same for that error as well.

[5] The military judge did, in fact, address several additional issues of constitutional significance with appellant. Indeed, before appellant took the stand, the military judge held an Article 39(a), UCMJ, session to discuss appellant's decision to waive his right to remain silent during the proceedings. Later, during appellant's testimony, the military judge stopped the proceedings on three occasions, and conducted Article 39(a), UCMJ, sessions without the presence of the panel in order

(continued . . .)

Nonetheless, once we determine there was error, we must determine whether appellant suffered prejudice from the introduction of this testimony. As noted previously, the defense counsel did not object to any reference to appellant's invocation of his rights and did not seek a limiting instruction. *See Moore*, 1 M.J. at 392. Since there was no objection, we rely on plain error analysis. Therefore, appellant has the burden of establishing the error materially prejudiced a substantial right. *Riley*, 47 M.J. at 279-80.

Although there were three separate discussions of appellant's decision to invoke his rights, we find none of the errors materially prejudiced the substantial rights of the appellant. Even when we consider the cumulative effect of the various violations, it does not outweigh the overwhelming evidence against appellant. Finally, we are satisfied beyond a reasonable doubt that the errors were harmless beyond a reasonable doubt.

We reach these conclusions based on several factors. The trial counsel never argued or made any reference to appellant's exercise of his rights in the opening statement or the closing argument. In fact, the first incident occurred during the defense's direct examination of their own witness, SA JT. That testimony consisted of one passing reference by the witness. A single mention of appellant's refusal to provide a statement, in the context of a longer answer, does not, by itself, necessarily rise to prejudicial error. *See Ross,* 7 M.J. at 176-77. Furthermore, the evidence of appellant's invocation of his rights was not elicited until the defense case. This was not a situation where the government attempted to highlight appellant's silence as part of its trial strategy. Instead, the government counsel only reacted to appellant's alibi testimony. *Cf. Riley*, 47 M.J. at 277 (finding that the government's decision to begin their case with testimony by a law enforcement agent that repeatedly remarked on appellant's silence, impermissibly tainted the view of the remaining evidence).

More importantly, the government's case against appellant was supported by overwhelming evidence. *See, e.g. Gilley*, 56 M.J. at 123. Appellant was positively identified by one of his co-conspirators, PFC JB, and the stolen money was found at the location and in the condition described by PFC JB. Furthermore, another soldier, SPC JE, testified that appellant had approached him and tried to include him in the conspiracy. SPC JE also testified that appellant and SPC TJ admitted to him that they participated in the crimes. The victim, Mr. DIIA identified appellant with

---

(. . . continued)
to discuss testimony that may have related to attorney-client privileged communications. After one such session, the military judge provided a limiting instruction.

a high degree of certainty as one of the perpetrators. Regarding appellant's alibi, the defense witnesses were not convincing in establishing a firm timeline that would have categorically demonstrated appellant was elsewhere at the time the offenses were committed. First, the burglary and robbery occurred only short distance away from the alibi location. Second, the alibi witnesses' chronology of events did not necessarily preclude appellate from participating in the crime.

Therefore, we find the evidence overwhelmingly establishes appellant's guilt, and the testimony concerning appellant's invocation of his rights did not materially prejudice his substantial rights and was harmless beyond a reasonable doubt.

## IV. CONCLUSION

On consideration of the entire record, the assigned errors, and the allegations raised by appellant pursuant to *Grostefon*, we affirm the findings of guilty and sentence approved by the convening authority. Accordingly, the findings of guilty and the sentence are AFFIRMED.

Senior Judge KERN and Judge ALDYKIEWICZ concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

17